Eddie Mitchell TASBY and Philip Wayne Tasby, by their parent and next friend, Sam Tasby, et al., Plaintiffs,

v.

Dr. Nolan ESTES, General Superintendent of Dallas Independent School District, et al., Defendants.

Civ. A. No. 3–4211–C.

United States District Court,
N. D. Texas,
Dallas Division.

July 16, 1971.

Supplemental Order Aug. 9, 1971.

Supplemental Memorandum
Aug. 17, 1971.

Edward B. Cloutman, III, Douglas R. Larson, Johnston, Polk & Larson, Rod Surratt, Sylvia M. Demarest, George Martinez, Dwight Moore, Walter Irvin, Cleophas Steele, Dallas Legal Services Project, Dallas, Tex., Melvyn Leventhal, Anderson, Banks, Nichols & Leventhal, Jackson, Miss., Ed Idar, Jr., Mario Obledo, Mexican-American Legal Defense and Education Fund, San Antonio, Tex., for plaintiffs.

Spafford, Gay & Whitham by Franklin Spafford, and Warren Whitham, Dallas, Tex., for defendants.

W. Ted Minick, Atwell, Malouf, Musslewhite & Bynum, Dallas, Tex., for intervenor James T. Maxwell.

Smith, Smith, Dunlap & Canterbury by Lee Smith, Dallas, Tex., for intervenors Donald E. Curry, Gerald A. Van Winkle, Joe M. Gresham, Edmund S. Rouget and Robert A. Overton.

Woodruff, Kendall & Smith by David M. Kendall, Jr., Dallas, Tex., for intervenors Greater Dallas Council of Citizens for Neighborhood Schools.

Edwin L. Davis, Davey-Davis, Inc., Dallas, Tex., for intervenors, Herman Bond, et ux., Individually and as next friend for his minor son, Steven Bond, et al.

James G. Vetter, Jr., Brown, Elliott, Vetter & Denton, Dallas, Tex., for intervenors Citizens of Oak Cliff.

N. Alex Bickley, City Atty., Dallas, Tex., for intervenor City of Dallas.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

It is difficult to believe in this day and time that anyone anywhere would be surprised, shocked or amazed at this case or at the pendency of this law suit. It would be difficult for me to believe that anyone anywhere would be surprised, shocked or amazed by what I am about to rule in this case at this time.

On May 17, 1954, the Supreme Court of the United States, in Brown v. Board of Education, said, "In the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated . . . are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment." In 1955 the Supreme Court handed down its opinion in Brown #2 ordering desegregation of schools with "deliberate speed".

In the 16 years since Brown #2 little progress had been made and the Courts were confronted with actions by School Boards that used every device imaginable to evade and avoid their responsibilities in this regard.

In 1968 the Supreme Court, in Green v. County School Board, pointed out this lack of progress and required that "The burden on a school board today is to come forward with a plan that promises realistically to work . . . now . . . until it is clear that state-imposed segregation has been completely removed. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

Despite this plain language in 1969 there was before the Court fresh evidence of the dilatory tactics of many school authorities and the Court, in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19, held that the remedy must be implemented *forthwith*.

On April 20, 1971, Chief Justice Berger of the Supreme Court delivered for a unanimous court his landmark opinion in Swann v. Charlotte-Mecklenberg Board of Education which said, among other things, the objective today remains to eliminate from the public schools all vestiges of state imposed segregation.

When it appears as it clearly does from the evidence in this case that in the Dallas Independent School District 70 schools are 90% or more white (Anglo), 40 schools are 90% or more black, and 49 schools with 90% or more minority, 91% of black students in 90% or more of the minority schools, 3% of the black students attend schools in which the majority is white or Anglo, it would be less than honest for me to say or to hold that all vestiges of a dual system have been eliminated in the Dallas Independent School District, and I find and hold that elements of a dual system still remain.

The School Board has asserted that some of the all black schools have come about as a result of changes in the neighborhood patterns but this fails to account for many others that remain as segregated schools. The defendant School Board has also defended on the ground that it is following a 1965 Court order. This position is untenable.

The *Green* and *Alexander* cases have been handed down by the Supreme Court since the 1965 order of the Court of Appeals for the Fifth Circuit to the Dallas Independent School District. There have been too many changes in the law even in the Fifth Circuit and it is

fairly obvious to me that the defendant School Board and its administration have been as aware of them as I. For example, the case of Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 was handed down in December of 1969. This was the case in which the Court ordered, among other things, desegregation of faculty and other staff, majority to minority transfer policy, transportation, an order with reference to school construction and site selection, the appointment of bi-racial committees. The Dallas School Board has failed to implement any of these tools or to even suggest that it would consider such plans until long after the filing of this suit and in part after the commencement of this trial.

There is another question which this Court must decide and that has to do with the complaint of those plaintiffs who brought this suit as Mexican-Americans in behalf of themselves and all others similarly situated.

■■ It is my opinion and I so hold that Mexican-Americans constitute a clearly separate and clearly identifiable ethnic group. No one ever had any doubt about Lee Trevino's ethnic origin and this is true of many many others. But as was said by Judge Jack Roberts of the Federal Court in Austin, "But the mere existence of an ethnic group, regardless of its racial origin, and standing alone, does not establish a case integrating it with the remainder of the school population. Rather, the plaintiff must show that there has been some form of de jure segregation against the ethnic minority." And I find that the plaintiff Mexican-Americans have failed in maintaining the burden of proof. I would point out, however, that this particular ruling may not be too significant in the light of what I propose to do in this regard and that is that any plan or remedy must take the Mexican-American into consideration and there will be the appointment of a tri-ethnic committee as distinguished from a bi-racial advisory committee. In this connection, I would

advise that I will appoint Rev. Zan Holmes, Rene Martinez, and Attorney David Kendall on this committee, if they are willing to serve.

I have heretofore indicated during this trial that I would call upon the Board of the Dallas Independent School District for its plan to eliminate segregation in its school district and that I would expect that done now. Judge Woodrow Seals in Corpus Christi was confronted by a board that stood like a balky steer in the road and refused to do anything and he pointed out that he was deprived of the expertise of the Board of Education and its administrative personnel in the fashioning of a plan and order of the Court that would eliminate the dual system. Judge Jack Roberts in Austin has called upon the parties, both plaintiffs and defendants, to file with the Court an adequate and sufficient plan. Judge Leo Brewster in Fort Worth has done the same thing. Defendant Dallas Independent School District has throughout this trial asserted its good faith and its willingness to cooperate with the Court and has also stated that it is opposed to segregation. Therefore, I direct that the Dallas Independent School District Board file with this Court its plan for the establishment of a unitary school system by 10:00 A.M. next Friday, July 23, 1971. It is obvious to me that the Board has been considering these matters for some time and that it has done some soul searching in this regard, as it should do.

■ Now all of this is not as grim as it sounds. I am opposed to and do not believe in massive cross-town bussing of students for the sole purpose of mixing bodies. I doubt that there is a Federal Judge anywhere that would advocate that type of integration as distinguished from desegregation. There are many many other tools at the command of the School Board and I would direct its attention to part of one of the plans suggested by TEDTAC which proposed the use of television in the elementary grades and the transfer of classes on occasion by bus

during school hours in order to enable the different ethnic groups to communicate. How better could lines of communication be established than by saying, "I saw you on TV yesterday," and, besides that, television is much cheaper than bussing and a lot faster and safer. This is in no sense a Court order but is merely something that the Board might consider.

At this point I want to make a few remarks about TEDTAC. That agency has been harassed, intimidated, pressured and abused in many other ways, and it did not deserve this type of treatment. The politicians have made their speeches, have called their office demanding names, suggesting loss of employment sometimes subtly and sometimes not so subtly. Some of the staff of TEDTAC have been obliged to unlist their phone numbers in order to escape harassing telephone calls. I have considered the entry of an order in this case that such harassment, intimidation and threats will be considered an obstruction of justice and therefore in contempt of this Court. It was TEDTAC which first suggested the "confluence of cultures" concept as was testified to by Dr. Estes. TEDTAC has worked in many of these matters and sincerely desires to be of assistance to the School Boards that are confronted with these problems. I would also suggest that the School Board could well hear from the plaintiffs' representatives as well as the ones who heretofore have been named as members of the tri-ethnic committee of this Court if they are willing to serve.

I would suggest that the Dallas Board of Education could make the "confluence of cultures" an actuality rather than a catch-phrase or a dream and that it could be of vast help to the City of Dallas in deserving its Chamber of Commerce appellation of "City of Excellence."

## SUPPLEMENTAL ORDER FOR PARTIAL STAY OF JUDGMENT

The Court has continued to consider the Judgment entered on August 2, 1971, and for the reasons stated in Supplemental Opinion to be filed herein, on its own motion, has concluded that parts of said Order directing pairing/grouping and satelliting at the secondary level should be stayed in order for the Court to determine whether or not the other tools of desegregation provided for in the August 2 Order have effectively desegregated the Dallas School System before resorting to the movement and transportation of students,

It is accordingly ordered that:

1. Paragraph 10–B of the August 2, 1971 Judgment, pertaining to pairing/grouping of Kimball, Carter and South Oak Cliff High Schools;

2. Paragraph 10–C providing for the satelliting of students from the following elementary school zones—Hassell, Browne, Wheatley, Ray, Frazier, Carr, Anderson, Dunbar, Arlington Park, Tyler and Carver—into high schools, as shown on Appendix A of the Judgment;

3. Paragraph 11–B of said Order pertaining to Junior High Schools and pairing Atwell, Browne, Hulcey, Storey and Zumwalt;

4. Paragraph 11–C also pertaining to Junior High Schools and pairing Stockard, Edison and Sequoyah; and

5. Paragraph 11–D pertaining to satelliting students from the following named elementary school zones—Hassell, Harris, Arlington Park, Tyler, and part of Carver into Junior High Schools, as shown on Appendix B of said Order,

be and the same are hereby stayed until January 10, 1972, and students assigned in the satellite zones by the August 2nd Order are to be reassigned by the Board of Education to appropriate High and Junior High Schools, taking into consideration capacity and the establishment of a unitary school system.

In all other respects the August 2, 1971 Judgment of this Court shall remain in full force and effect.

## MEMORANDUM OPINION ON FINAL DESEGREGATION ORDER

On July 16, 1971, Memorandum Opinion and Order was entered by this Court

finding, among other things, all vestiges of a dual school system have not been eliminated in the Dallas Independent School District (DISD). Reference is made to that Memorandum Opinion and Order for all purposes and it is incorporated herein.

The DISD ranks as the eighth largest school system in the Nation, serving approximately 180,000 students attending 180 campuses, and encompasses 351 square miles extending a distance of 35 miles from its north to its south boundaries. Its scholastic population is comprised of approximately 59% Anglos, 33% Blacks, and 8% Mexican-Americans. After several years of unproductive litigation attempting to desegregate the DISD, finally in 1965 in compliance with the mandate handed down in Britton v. Folsom, 5 Cir., 350 F.2d 1022, the School Board adopted the neighborhood school concept which has been continued up until orders were entered by this Court on August 2, 1971 and August 12, 1971. This neighborhood school concept alone failed to establish a unitary school system.

■ The July 16 Order of this Court directed the School Board of DISD to file its plan for the establishment of a unitary school system by 10:00 o'clock A.M. Friday, July 23, 1971, with which Order the Board complied. Trial resumed upon the claimed merits and demerits of that plan as being productive of a fully desegregated school system. The Board's plan is designated as Defendants' Exhibit No. 20 in this Record and is entitled "Confluence of Cultures". With appendices, it consists of some 120 pages and is fully expressive of the Board's intention to provide a quality education equally for all students and pupils enrolled in DISD, and I find and hold that the Board of Education of DISD is in good faith and is committed to the principle of equal quality education.

The Texas Educational Desegregation Technical Assistance Center (TEDTAC), pursuant to this Court's Order of October 20, 1970, submitted a plan which could be used to desegregate DISD. This plan was filed by TEDTAC after school officials refused to consult or confer with TEDTAC in regard to some three alternate proposals or plans for the desegregation of DISD. The basic principles which the TEDTAC staff followed in drawing the proposals were to maintain majority white schools and use contiguous pairing wherever possible, with no transportation recommended for secondary students. At the secondary levels, desegregation was accomplished by extensive gerrymandering of attendance zone lines, resulting in "strip-zoning". Junior high school zones were drawn to conform as nearly as possible to the Senior high school zones in order to retain the feeder system which both TEDTAC and the School Board deemed essential. At the elementary level the TEDTAC plan on file proposed contiguous pairing, non-contiguous pairing and grouping of attendance zones. This would have required extensive bussing at the elementary level.

■ At the trial Mr. James P. Williams, Project Administrator of TEDTAC, positively testified that TEDTAC did not recommend nor advocate the adoption of this plan for a school system of the size and complexity of DISD. Plaintiffs, however, adopted the so-called TEDTAC plan and submitted it as their plan on July 16, 1971, with minor modifications, that is, specifically recommending that Lincoln and North Dallas High Schools remain open as high school facilities and that the Career Development Center at Skyline High School be preserved and that the Pearl C. Anderson school be continued as a Junior High facility. The Court has concluded that to adopt the gerrymandering, pairing, and grouping plan submitted by Plaintiffs, accompanied by the massive crosstown bussing required to implement such a plan, would result in extensive "abrasions and dislocations" and a disruption of the educational process, and is rejected in the light of the teaching of Allen v. Board of Public Instruction

of Broward County, 432 F.2d 362 (5th Cir. 1970), to keep "such problems at a minimum". The School Board's plan for secondary schools was essentially a geographic zoning plan which extended the existing zone lines of previously white schools to include contiguous elementary zones in areas with large minority student population and which zoned some Anglo students into previously minority schools. In Dallas, minority ethnic groups are concentrated in the south part of the inner city and in the southwest quadrant of the District in Oak Cliff and West Dallas. The Board's plan resorted to "satelliting" Black neighborhood zones into previously all white schools in the northern and eastern parts of the District. By its Desegregation Order of August 2, this Court proposed satelliting of students at the secondary level to achieve an increase in the ethnic composition, as well as the pairing or grouping of secondary level schools in the Oak Cliff area of Dallas (Southwest quadrant). Because of the demographic patterns of DISD, contiguous pairing could only have been accomplished in the Oak Cliff area and review of the Court's Order produced a situation where many students in Oak Cliff would attend five different schools during the six years of their secondary level education. This pairing would also have had a disruptive effect on extracurricular activities and would also have placed a greater burden on Black students by ordering additional satelliting. This result, in my opinion, is educationally unsound and therefore unfair and unreasonable. Reference is here made to Supplemental Opinion regarding Partial Stay of Desegregation Order, and same is incorporated herein for all purposes. Accordingly, on August 9, 1971, a Stay Order was entered staying the pairing/grouping of secondary students in the Oak Cliff area and also staying the additional satelliting provided in the August 2 Order. Pursuant to that Stay Order, the School Board, on August 12, filed with the Court a new Assignment for Junior and Senior High School students as provided in Resolutions adopted on August 11, 1971. By Order dated August 12, 1971, the Resolutions of the Board of Education directing the assignment of Junior and Senior High School students as therein provided were approved by the Court. Racial balance approved and adopted by this Court, taking into account the August 2 Order, the August 9 Stay Order, and the August 12 Order, for Senior and Junior High School students is shown on Appendices A and B attached hereto and made a part hereof. These Orders taken together constitute the final Desegregation Order of this Court.

The adoption of a plan of desegregation for a school system of the size and complexity of DISD has been commented upon briefly. The problems result, of course, from private housing patterns that have come into existence and not from any action of the DISD. The complex school districts bear little resemblance to the factual situation of *Green* or even the fact situation of *Swann* which served 84,000 pupils in 107 schools. As was pointed out by the Supreme Court in *Swann*, "The record in this case reveals the familiar phenomenon that in the metropolitan areas minority groups are often found concentrated in one part of the city. In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change." 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554. In attempting to pattern a remedy for the DISD situation this Court has sought not only to achieve an equal integrated quality education for all students, but has been conscious of the necessity of the stabilization of the private residential patterns in the district. It is the opinion of this Court that some new approach and solution to this problem must be found. The Fifth Circuit has applauded "imaginative and innovative" actions by the courts in this effort. United States v. Bd. of Education of Baldwin County, 423 F.2d 1013, (5th Circuit, 1970); Bivins v. Bibb County Bd., 424 F.2d 97

(5th Circuit, 1970). As an effort in this direction this Court has adopted the so-called "T. V. Plan" with a view to desegregation at the elementary level. The plan of using television in the schools must be credited to Mr. J. "Pete" Williams, Project Administrator of TEDTAC, who testified that after consultation with his staff he was deeply concerned about the desegregation problems of a huge metropolitan center such as Dallas, and he went into seclusion to study the matter and reached the conclusion that the use of television to establish audio and visual contact and communication by the students would be an effective tool of desegregation. In its July 16 Order, this Court suggested to the Board that an investigation be made of the T.V. plan as a means of establishing the required contact between students, and in its desegregation plan filed July 23, the Board submitted the use of T.V. and other audio-visual resources as a part of its plan. The plan adopted by this Court by the August 2 Order varies considerably from that proposed by the Board. The August 2 Order retains the neighborhood school concept for elementary schools but directs the establishment of a clustering of elementary attendance zones in such a manner as to group those elementary schools together so as to provide an approximate 2:1 ratio of Anglo classrooms to minority classrooms and to establish elementary class schedules and courses of study so as to provide each elementary student with a daily minimum of one hour of contact with students of another race, such contact to be a simultaneous two-way oral and visual communication via television cable between two or more schools. The classrooms of each such elementary school is to be identifiably paired in such a manner that approximately two Anglo classrooms are paired with one minority classroom for the entire academic year with two to seven studio classrooms being established at each elementary school and such studio rooms to be equipped so as to provide the teacher

and students seated therein the ability to see and hear the students and teachers in the other paired classrooms who will also be seated in studio rooms at their schools. Additionally, the August 2 Order requires the Board to provide at least one weekly visit of an educational nature during regular school hours between the two or more paired classrooms that daily communicate with each other, such visits providing not less than three hours of personal contact between the paired classrooms. Attached to the Order is Appendix C, suggesting a possible series of clusters which provide the approximate 2:1 ratio, but the Board is given discretion to establish any other set of clusters which might be more technically acceptable and more economically feasible so long as the stated ratio of approximately two to one is maintained.

The Order also provides for the creation of a new administrative position of Cluster Director and outlines the duties and responsibilities of that official. A time schedule is adopted requiring maximum operational level by May 1, 1972, subject to the impossibility of acquisition of materials. A committee is appointed to provide professional leadership to insure that the elementary T.V. plan adopted effectively functions as a tool of desegregation.

There is no "case authority" for this approach but the Court is convinced that it is far more than "part-time desegregation". This is a guaranteed district wide, every day communication that a minimum of 7 of the approximately 30 hours in the school week will be in this concentrated integrated environment. By the effective method of team teaching these classes will be linked together as one educational unit. The individual students will be on a personal "first name" basis with members of the other ethnic groups. Neither is this purely an educational program, although the use of television as an effective teaching method is gaining recognition throughout the country. This Court is firmly convinced that such a one to one pro-

gram of physical and electronic communication, when combined with the other desegregation tools of this Order, including a completely integrated secondary system, will be a truly effective tool in eliminating all the vestiges of segregation, root and branch, beginning with the cultural attitudes of elementary children who "have not yet learned prejudice".

In attempting to deal with the massive problems of desegregation of this School district, the Court has ordered

(1) Desegregation of faculty and staff;

(2) The majority to minority transfer option permitting the eligible student to transfer to any school in the District and providing transportation for the transferring student who desires it. Additionally, the Court has offered the incentive of a four-day school week for any high school student exercising this right, which could well be appealing not only to black students but also to Anglos. The Board is also directed to give wide publicity of the option and full explanation, with high school teachers assigned the task of being available to explain the advantages of the transfer provision;

(3) By its Confluence of Cultures Program which the Board is ordered to implement, the DISD has undertaken an ambitious program to produce quality integrated education with a view to bringing about communication, harmony and understanding between the different ethnic groups with particular attention to the bi-lingual education program for Mexican-Americans and directing that Mexican-Americans be permitted to transfer to the centers where this program is offered when it does not exist at their schools and providing transportation, if desired;

(4) The Board is ordered to institute and maintain the Compensatory Education Program described on Page 29 of the Board's July 23, 1971 plan with any proposed discontinuance to be first reviewed with the Tri-Ethnic Committee;

(5) To initiate and implement the grade level performance for all economically deprived students described on Page 26 and Appendix H of the Board's July 23 plan;

(6) Consultation and approval of the Tri-Ethnic Committee is required before selecting future school sites or beginning construction and directing that all school construction and site selection shall be done in a manner that will prevent the recurrence of a dual school structure;

(7) Transportation on a non-segregated and otherwise nondiscriminatory basis is ordered;

(8) The Board is directed to insure that all extracurricular activities continue on a desegregated basis;

(9) A Tri-Ethnic Committee with new and enlarged powers is created, which committee will review operation of the transportation system, teacher assignment, the majority to minority transfer rule, and the selection of school sites. The committee is to report to the Court on a monthly basis as distinguished from a semi-annual basis and will advise the Court as to the maintenance of a unitary school system. Adequate office space will be made available for the committee in the Federal Building and the Board is directed to provide sufficient funds for the employment of two secretaries, one of whom will be a bilingual Mexican-American, telephones, and appropriate office equipment and supplies;

(10) The School District is to report on November 1, 1971 and on April 15, 1972, and annually thereafter on April 15 of each succeeding year, as required by *Singleton;* and

(11) In line with the teachings of Ellis v. Bd. of Public Instruction of Orange County, Fla., (5th Cir., 1970), 423 F.2d 203, calling attention to the following provision in *Green,* " . . . whatever plan is adopted will require

evaluation in practice, and the court should retain jurisdiction until it is clear that the state-imposed segregation has been completely removed." 391 U.S. 430 at 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716, this Court has retained jurisdiction of this case to the end that a unitary school system shall be maintained in the Dallas Independent School District.

The ultimate goal in these cases is to remove all vestiges of a dual system and at the same time truly provide a quality *integrated* educational system. It goes without saying that no such system can be integrated if there are but few remaining white students within the boundaries of the DISD, and this Court hopes to avoid any such loss. The Court is firmly of the opinion that to allow the schools to operate as ordered by the Court in its August 2 Judgment as to elementary schools, and as ordered by the Court in its August 12 Order following the August 9 Stay as to secondary schools, will achieve the desired result—quality integrated education—and this community, black and white, will accept such arrangement and work together for the good of all its citizens.

## SENIOR HIGH SCHOOL ETHNIC COMPOSITION

### Appendix A

**SENIOR HIGH SCHOOL**
**ETHNIC COMPOSITION**
1971-72

| School | Black | Pct. | Mex.-Amer. | Pct. | Anglo | Pct. | Total Minority | Pct. | Total Enrollment |
|---|---|---|---|---|---|---|---|---|---|
| Adams, Bryan | 415 | 11.3 | 22 | .6 | 3238 | 88.1 | 437 | 11.8 | 3675 |
| Adamson, W. H. | 200 | 15.4 | 125 | 9.6 | 975 | 75.0 | 325 | 25.0 | 1300 |
| Carter, David | 685 | 29.97 | 49 | 2.14 | 1551 | 67.87 | 734 | 32.12 | 2285 |
| Hillcrest | 300 | 12.5 | 15 | .6 | 2085 | 86.9 | 315 | 13.1 | 2400 |
| Jefferson, T. J. | 355 | 14.8 | 112 | 4.8 | 1938 | 80.6 | 467 | 19.4 | 2405 |
| Kimball, J. F. | 425 | 17.5 | 59 | 2.4 | 1941 | 80.0 | 484 | 20.0 | 2425 |
| Lincoln (9-12) | 1900 | 82.8 | 120 | 5.2 | 275 | 12.0 | 2020 | 88.0 | 2295 |
| North Dallas | 160 | 12.3 | 744 | 57.1 | 400 | 30.7 | 904 | 69.3 | 1304 |
| Pinkston, L. G. | 841 | 62.6 | 311 | 23.2 | 191 | 14.2 | 1152 | 85.8 | 1343 |
| Roosevelt, F. D. | 1100 | 83.1 | 43 | 3.3 | 180 | 13.6 | 1143 | 86.4 | 1323 |
| Samuell, W. W. | 390 | 17.0 | 42 | 1.8 | 1858 | 81.2 | 432 | 18.8 | 2290 |
| Seagoville | 190 | 17.0 | 49 | 4.4 | 881 | 78.6 | 239 | 21.3 | 1120 |
| Skyline | 678 | 28.6 | 521 | 22.0 | 1169 | 49.4 | 1199 | 50.6 | 2368 |
| South Oak Cliff | 2000 | 96.7 | 31 | 1.5 | 37 | 1.2 | 2031 | 98.2 | 2068 |
| Spruce, H. Grady | 500 | 22.0 | 61 | 2.7 | 1719 | 75.3 | 561 | 24.6 | 2280 |
| Sunset | 420 | 23.1 | 150 | 8.2 | 1250 | 68.7 | 570 | 31.3 | 1820 |
| White, W. T. | 642 | 22.6 | 20 | .7 | 2180 | 76.7 | 662 | 23.3 | 2842 |
| Wilson, Woodrow | 180 | 11.4 | 101 | 6.4 | 1299 | 82.2 | 281 | 17.7 | 1580 |
| TOTAL | 11381 | 30.7 | 2575 | 6.9 | 23167 | 62.4 | 13956 | 37.6 | 37123 |

[A5744]

## JUNIOR HIGH SCHOOL ETHNIC COMPOSITION

### Appendix B

JUNIOR HIGH SCHOOL
ETHNIC COMPOSITION
1971-72

| School | Black | Pct. | Mex.-Amer. | Pct. | Anglo. | Pct. | Total Minority | Pct. | Total Enrollment |
|--------|-------|------|------------|------|--------|------|----------------|------|------------------|
| Atwall, W. H. | 225 | 16.9 | 15 | 1.2 | 1085 | 81.9 | 240 | 18.1 | 1325 |
| Browne, T. W. | 400 | 22.6 | 23 | 1.3 | 1347 | 76.1 | 423 | 23.9 | 1770 |
| Cary, E. H. | 250 | 13.3 | 127 | 6.7 | 1507 | 80.0 | 377 | 20.0 | 1884 |
| Comstock, E. B. | 500 | 28.4 | 104 | 5.9 | 1156 | 65.7 | 604 | 34.3 | 1760 |
| Edison, T. A. | 895 | 53.9 | 650 | 39.2 | 115 | 6.9 | 1545 | 93.1 | 1660 |
| Florence, Fred | 400 | 21.1 | 42 | 2.2 | 1458 | 76.7 | 442 | 23.3 | 1900 |
| Franklin, Ben | 220 | 14.0 | 7 | .5 | 1343 | 85.5 | 227 | 14.5 | 1570 |
| Gaston, W. H. | 180 | 12.6 | 37 | 2.6 | 1213 | 84.8 | 217 | 15.2 | 1430 |
| Greiner, W. E. | 4 | .3 | 180 | 13.6 | 1143 | 86.1 | 184 | 13.9 | 1327 |
| Hill, Robert T. | 190 | 11.8 | 23 | 1.4 | 1402 | 86.8 | 213 | 13.1 | 1615 |
| Holmes, O. W. | 2500 | 98.4 | 32 | 1.3 | 8 | .3 | 2532 | 99.7 | 2540 |
| Hood, J. B. | 480 | 21.5 | 57 | 2.6 | 1693 | 75.9 | 537 | 24.0 | 2230 |
| Hulcy, D. A. | 400 | 28.6 | 63 | 4.5 | 937 | 66.9 | 463 | 33.1 | 1400 |
| Long, J. L. | 130 | 9.4 | 124 | 9.0 | 1126 | 81.6 | 254 | 18.4 | 1380 |
| Marsh, T. C. | 250 | 13.4 | 19 | 1.0 | 1600 | 85.6 | 269 | 14.4 | 1869 |
| Rusk, T. J. | 150 | 18.4 | 367 | 45.1 | 297 | 36.5 | 517 | 63.5 | 814 |
| Rylie | 0 | 0 | 25 | 4.8 | 500 | 95.2 | 25 | 4.8 | 525 |
| Sequoyah | 1074 | 92.3 | 76 | 6.5 | 13 | 1.1 | 1150 | 98.9 | 1163 |
| Spence, Alex | 180 | 24.2 | 350 | 47.0 | 214 | 28.8 | 530 | 71.2 | 744 |
| Stockard, L. V. | -0- | -0- | 190 | 15.6 | 1025 | 84.4 | 190 | 15.6 | 1215 |
| Storey, Boude | 1245 | 73.7 | 194 | 11.5 | 250 | 14.8 | 1439 | 85.2 | 1689 |
| Walker, E. D. | 220 | 20.6 | -0- | -0- | 850 | 79.4 | 220 | 20.6 | 1070 |
| Zumwalt, Sarah | 1424 | 98.2 | 17 | 1.9 | 9 | .5 | 1441 | 99.4 | 1450 |
| **TOTALS** | 11317 | 32.96 | 2722 | 7.92 | 20291 | 59.1 | 14039 | 40.9 | 34330 |

[A5743]

---

## SUPPLEMENTAL OPINION REGARDING PARTIAL STAY OF DESEGREGATION ORDER

On August 2, 1971, this Court entered its Desegregation Order in this case. The desegregation plan, filed by DISD, proposed for satelliting of students at the secondary level to achieve an increase in the ethnic composition. In the light of some of the guidelines laid down in

Swann v. Charlotte-Mecklenburg and many opinions of the Court of Appeals for the Fifth Circuit, the August 2 Order of this Court added to the School Board's plan some pairing/grouping of secondary level schools and additional satelliting of students. This part of the Court's Order directed the movement of in excess of 15,000 Junior and Senior High School students and also overloaded at least one high school by 1,000 students beyond its capacity. Transportation (bussing) was also ordered. The School Board plan would have, through satelliting, caused the movement of approximately 7,000 students.

■ Because of the demographic patterns of the Dallas Independent School District, the contiguous pairing of secondary level students could have been accomplished only in the Oak Cliff area of the school district. Contiguous pairing or grouping of secondary level schools in the other sections of DISD could have only produced movement of white students from one school to another, or all Black students from one school to another. A careful review of the Court's Order providing for pairing or grouping of Carter, Kimball and South Oak Cliff High Schools and feeder Junior High Schools produced a situation where many, many students would attend five different schools during the six years of their secondary level education. Such pairing or grouping also would have had a disruptive effect upon the extracurricular activities (athletics, bands, drill teams, and the like), and would have placed a greater burden on Black students through the additional satelliting ordered by the Court on August 2. It appears abundantly in this Record, for example, that South Oak Cliff High School, which is over 90% black, is justifiably proud of its athletic program which has taken its football team twice into the State finals and the movement of its 11th grade students to other high schools would have a harmful effect on its athletic programs. But more important, the pairing of these secondary schools will adversely affect the educational opportunities of these students in that the full and complete academic educational program and curriculum of the DISD in its secondary schools in this section of Dallas will surely be injured if courses available over a three or four year period are in any way limited by the dictates of arbitrary student assignments by grade levels in the secondary schools. The education through a wide course selection being available as chosen by the student should not be made to suffer for the purpose of arbitrary racial mixing to alleviate a condition which, in this particular section of the school district, results primarily from private housing patterns coming into existence since 1965 and not from any action of the DISD.

■ Requiring the attendance of secondary level students at five different schools through six years of education is educationally unsound, therefore unfair and unreasonable. The additional satelliting ordered by the Court on August 2 places more of the burden upon the black students and this is unfair and unreasonable; therefore, for these reasons the Court, on its own Motion, on August 9, 1971, stayed until January 10, 1972 those portions of that Order requiring the pairing or grouping of the three high schools and the Junior High feeder schools in the Oak Cliff area, and that portion of the Order requiring satelliting in addition to that proposed by the Dallas Independent School District School Board.

■ The August 2 Order of this Court provides new and other powerful tools which the Court firmly believes will bring about a unitary quality education for all students. For example, I have great faith and confidence in the new Majority to Minority Transfer Rule contained in the August 2 Order, which provides the incentive of a four-day school week for high school students. This could well be appealing to both Black and White students and produce a unitary school system. The Board has been ordered to publicize and encourage students to make use of the Majority to Minority Transfer Rule. Desegregation of faculty, of

course, has been ordered and under the watchful eye of a Tri-Ethnic Committee which has been given enlarged powers and duties should produce an equal quality education for all students. For these reasons also, this Court is of the opinion that the parts of the Order referred to above should be stayed until at least January 10, 1972, so that a more accurate evaluation of this Court's Desegregation Order can be made. This Court has endeavored to write a Desegregation Order that would not only produce an equal quality education but would also stabilize housing patterns in this school district and discourage resegregation that has occurred in cities like Atlanta, Washington, D. C., Los Angeles, and others, and is firmly convinced that the new and innovative tools of desegregation adopted by this Court should be given some time for their effectiveness to be determined.

Hence the August 9, 1971 Partial Stay Order.