Delbert HAWKINS et al.

v.

Thomas COLEMAN et al.

No. CA–3–5774–B.

United States District Court,
N. D. Texas,
Dallas Division.

June 5, 1974.

See also, 5 Cir., 475 F.2d 1278.

John F. Jordan, Sylvia M. Demarest, Douglas R. Larson, Dallas, Tex., for plaintiffs.

Warren Whitham, James C. McCoy, Dallas, Tex., for defendants.

## OPINION

HUGHES, District Judge.

After two years of litigation and two appeals to the Fifth Circuit, on May 7, 1974, this Court commenced hearings on plaintiffs' plea for permanent injunctive

relief. Upon a consideration of the evidence, the briefs and arguments of counsel, this Opinion has been entered.

The Original Complaint was filed on April 17, 1972, by Delbert Hawkins, by his parent and next friend Ruth Hawkins, on behalf of himself and a class of black students within the Dallas Independent School District (DISD) arising from his suspension from the DISD contesting the adoption, substance and enforcement of the DISD student suspension procedures on the grounds of race discrimination, the denial of equal protection, and the denial of both substantive and procedural due process. A Temporary Restraining Order was entered on April 19, 1972, ordering the immediate reinstatement of plaintiff Hawkins and restraining defendants from enforcing the DISD indefinite suspension policies and procedures. Following an evidentiary hearing, a Preliminary Injunction was entered on May 2, 1972.

On appeal pursuant to 28 U.S.C. § 1292(a)(1), the Fifth Circuit ruled that portion of the preliminary injunction ordering reinstatement of plaintiff Hawkins to be moot because the school year had ended. The remaining issues were remanded to this Court for further consideration.

On remand it was determined by the Court that the "class" represented by plaintiff Hawkins is comprised of all black students who are currently enrolled or assigned to schools operated by the DISD at which white Anglo-American students outnumber black American students. (Pl.Ex. 1) [1]

The DISD is the principal school district in Dallas County, Texas, operating during the 1973–1974 school year some 24 high schools, 24 junior high schools, and 141 elementary schools. (Pl.Ex. 1). Defendants in this cause are various persons of responsibility within the DISD.[2]

Until the summer of 1971, the DISD continued to operate a dual school system, which segregated operations resulted in the Memorandum Opinion rendered by the Hon. William M. Taylor, Jr., in Tasby v. Estates, 342 F.Supp. 945 (N.D.Tex.1971), appeal pending.

As a result of the *Tasby* decision, the DISD entered into a program of student

---

1. From the DISD statistics on student enrollment by ethnic group for the school year 1973–1974, the schools at issue and the students within that "class" are as follows: (Pl. Ex. 1)

| High Schools | Blacks | Whites |
| --- | --- | --- |
| Bryan Adams | 269 | 2,615 |
| David W. Carter | 838 | 962 |
| Hillcrest | 237 | 1,505 |
| Thomas Jefferson | 320 | 1,383 |
| J. F. Kimball | 279 | 1,540 |
| Metropolitan East | 48 | 146 |
| W. W. Samuell | 173 | 1,423 |
| Seagoville | 189 | 928 |
| Skyline | 718 | 2,160 |
| H. G. Spruce | 445 | 1,643 |
| Sunset | 112 | 1,048 |
| W. T. White | 344 | 2,163 |
| Woodrow Wilson | 147 | 785 |
| Metropolitan S. | 80 | 117 |
| Metropolitan Crozier | 91 | 96 |

| Junior High Schools | | |
| --- | --- | --- |
| T. W. Browne | 490 | 1,143 |
| E. H. Cary | 288 | 1,115 |
| F. F. Florence | 306 | 1,213 |
| Benjamin Franklin | 166 | 780 |
| W. H. Gaston | 237 | 1,164 |
| W. E. Greiner | 87 | 794 |
| R. T. Hill | 146 | 1,148 |
| J. B. Hood | 439 | 1,371 |
| J. L. Long | 171 | 833 |
| T. C. Marsh | 253 | 1,173 |
| T. J. Rusk | 165 | 209 |
| Rylie | 5 | 464 |
| L. V. Stockard | 25 | 761 |
| E. D. Walker | 214 | 916 |

2. The defendants in this cause are as follows: (i) Thomas Coleman, Principal of Fred Florence Junior High School in which plaintiff Hawkins was enrolled in the 1971–1972 school year; (ii) Edward Artmann, Principal of Hillcrest High School; (iii) Robert Shelton, Administrative Assistant for School Operations of the DISD; (iv) Nolan Estes, General Superintendent of the DISD; and (v) the named members of the Board of Trustees of the DISD. All defendants are sued in both their official and individual capacities.

re-assignment designed to bring about an integrated school system. This program of student re-assignment resulted in a substantial number of black students being transferred from schools in which black students were in the majority to schools in which black students were in the minority.

The issues on this hearing are substantially the same as those in the original complaint and focus upon the student suspension procedures per se or upon the application of those procedures.

It is plaintiffs' contention that (1) the suspension procedures lack due process (2) the application of the procedures amounts to a denial of equal protection and (3) the procedures are enforced in a racially discriminatory manner.

Discussing the procedures themselves, it is defendant's contention that since the hearing on the preliminary injunction new procedures have been adopted which provide procedural due process.

As amended November 1973, the rules provide for three types of suspension discipline: (a) a 3-day suspension, (b) a 3 to 10 day suspension, and (c) a more than 10 day suspension. In case of a 3-day suspension action may be taken by the principal or the assistant principal. The parent is notified in writing of the reasons and is given a copy of the suspension policies and regulations.

If the conduct of a pupil is considered to be more serious the principal may suspend for a period of 10 days provided that the parent has been notified of the charges, given a copy of the policies and regulations and notified that he may request a hearing.

If it is considered by the principal that the conduct would materially interfere with the normal educational process the case is referred to the Associate Superintendent—School Operations for a

Third Party Hearing. The parent and pupil are notified of the charge and "his right of and procedure for a hearing". The parent is also informed "of his right to be assisted by an adult person who may present the pupil's side and interrogate witnesses".

■ In determining whether school rules provide for due process the Fifth Circuit in Boykins v. Fairfield Board of Education, 1974, 492 F.2d 697, said, "Basic fairness and integrity of the fact-finding process are the guiding stars." Measured by the requirement of the cases [3] this Court is of the opinion that DISD rules provide for procedural due process.

■ However, in the case of 3 day and 3–10 day suspensions, if the facts demonstrate "that a school official's involvement in an incident is such as to preclude his affording the student an impartial hearing" some one other than the principal should be designated to make a decision. Sullivan v. Houston Independent School District, 475 F.2d 1071 at 1077 (5th Cir. 1973). This direction to school officials, however, does not require an amendment of the rules as the rules cannot provide for every fact situation. Also in a 3–10 day suspension there may be situations where due process requires that there should be a hearing before the suspension, but this likewise would in the opinion of this Court be a special case requiring no amendment of the rules. Pervis v. La Marque Independent School Dist., 466 F.2d 1054 (5th Cir. 1972).

The greater part of plaintiffs' evidence dealt with the application and enforcement of the discipline procedures. This testimony consisted of (1) DISD student suspension data (2) analysis of that data by an expert witness and (3) evaluation of the meaning of the analysis.

---

3. Banks v. Board of Public Instruction of Dade County, 314 F.Supp. 285 (S.D.Fla. 1970) ; Dunn v. Tyler Independent School District, 460 F.2d 137 (5th Cir. 1972) ; Murray v. West Baton Rouge Parish School Board, 472 F.2d 438 (5th Cir. 1973).

The suspensions for all schools in the DISD for the year 1972–1973 are as follows: (Pl.Ex. 3).

School Year 1972–1973

| | Blacks | | Whites | |
| | % of the Enrollment | % of the Total No. of Suspensions | % of the Enrollment | % of the Total No. of Suspensions |
|---|---|---|---|---|
| All Levels | 38.7% | 60.5% | 50.4% | 30.2% |
| High Schools | 32.5% | 58.6% | 59.7% | 31.5% |
| Jr. High Schools | 38.0% | 62.1% | 51.4% | 29.0% |

The statistics for the first half of the 1973–1974 school year show a similar trend.

School Year 1973–1974 (Fall Semester)

| | Blacks | | Whites | |
| | % of Enrollments | % Suspensions | % Enrollment | % Suspensions |
|---|---|---|---|---|
| All Levels | 40.9% | 59.4% | 47.2% | 31.4% |
| High Schools | 35.4% | 58.7% | 56.4% | 33.2% |
| Jr. High Schools | 41.5% | 60.7% | 47.2% | 29.9% |

These unrebutted statistics establish that there exists within the DISD a disproportionate suspension ratio between black students and white students.

Wih respect to corporal punishment, the DISD for the school year 1972–1973 for the first time maintained statistics on the basis of race. (Pl.Ex. 3). An examination of these statistics reveals the following corporal punishment ratios.

School Year 1972–1973 [4]

| | Blacks | | Whites | |
| | % Enrollment | % Corp. Pun. | % Enrollment | % Corp. Pun. |
|---|---|---|---|---|
| All Levels | 38.7% | 45.8% | 50.4% | 43.6% |
| High Schools | 32.5% | 41.6% | 59.7% | 35.3% |
| Jr. High Sch. | 38.0% | 41.2% | 51.4% | 46.9% |

The computer print out of corporal punishment administered by the DISD during the first half of the 1973–1974 school year is shown to be as follows:

School Year 1973–1974 (Fall Semester) [5]

| | Blacks | | Whites | |
| | % Enrollment | % Corp. Pun. | % Enroll. | % Corp. Pun. |
|---|---|---|---|---|
| All Levels | 40.9% | 44.2% | 47.2% | 41.2% |
| High School | 35.4% | 38.3% | 56.4% | 33.6% |
| Jr. High Sch. | 41.5% | 47.4% | 47.2% | 42.3% |

4. Pl. Ex. 3 computed as to total incidents of corporal punishment including Mexican Americans. The percentage figures for blacks would increase about 9% if computed without the Mexican American statistics.

5. Pl. Ex. 2 computed as to total incidents of corporal punishment including Mexican Americans. Enrollment figures from Pl. Ex. 1.

While the statistics for corporal punishment are not as disproportionate for blacks and whites as the suspension statistics, they reveal a similar disparity.

Statistics of enrollment, 3-Day, 3–10 Day suspension and corporal punishment for the schools in which white students outnumber black students are as follows:

Fall Semester 1973–1974 [6]
School Year

| | Blacks | | | | Whites | | | |
|---|---|---|---|---|---|---|---|---|
| | % Enroll. | % 3 Day Susp. | % 3–10 Day Susp. | % Corp. Pun. | % Enroll. | % 3 Day Susp. | % 3–10 Day Susp. | % Corp. Pun. |
| **High Schools** | | | | | | | | |
| Bryan Adams | 8.9 | 32.5 | 35.7 | 27.7 | 87.1 | 67.1 | 64.2 | 66.8 |
| David W. Carter | 44.5 | 80.5 | 78.2 | 68.4 | 51.1 | 18.1 | 8.6 | 26.9 |
| Hillcrest | 13.3 | 46.0 | 0 | 65.0 | 84.9 | 52.3 | 0 | 33.7 |
| Thomas Jefferson | 16.8 | 35.1 | 66.6 | 25.0 | 78.0 | 47.8 | 33.3 | 75.0 |
| J. F. Kimball | 14.0 | 43.3 | 55.5 | 0 | 77.4 | 48.3 | 38.8 | 0 |
| Metropolitan East | 23.7 | 0 | 0 | 0 | 72.2 | 100.0 | 0 | 0 |
| W. W. Samuell | 10.3 | 28.2 | 18.7 | 0 | 85.3 | 66.6 | 81.5 | 0 |
| Seagoville | 16.0 | 49.5 | 90.0 | 41.6 | 78.9 | 44.6 | 0 | 51.6 |
| Skyline | 23.4 | 60.0 | 65.9 | 44.4 | 70.6 | 39.4 | 31.8 | 55.5 |
| H. G. Spruce | 19.9 | 41.3 | 54.3 | 24.0 | 73.5 | 51.0 | 40.2 | 68.9 |
| Sunset | 6.9 | 32.8 | 42.8 | 11.1 | 62.2 | 27.6 | 57.1 | 22.2 |
| W. T. White | 13.5 | 47.6 | 57.7 | 20.6 | 85.1 | 52.3 | 57.7 | 78.0 |
| Woodrow Wilson | 13.8 | 76.1 | 83.3 | 0 | 73.8 | 19.0 | 16.6 | 0 |
| Metropolitan S. | 39.2 | 0 | 0 | 0 | 57.3 | 0 | 0 | 0 |
| Metropolitan Crozier | 43.5 | no statistics | | | 45.9 | no statistics | | |
| **Jr. High Schools** | | | | | | | | |
| T. W. Browne | 27.9 | 74.6 | 82.7 | 43.7 | 65.1 | 19.1 | 13.7 | 50.0 |
| E. H. Cary | 18.1 | 25.0 | 47.3 | 31.8 | 70.3 | 67.5 | 31.5 | 59.1 |
| F. F. Florence | 18.7 | 42.9 | 58.1 | 42.5 | 74.1 | 52.2 | 36.3 | 50.8 |
| Benjamin Franklin | 17.1 | 66.6 | 86.9 | 63.3 | 80.6 | 31.5 | 13.0 | 34.8 |
| W. H. Gaston | 15.8 | 58.3 | 82.6 | 45.9 | 78.0 | 41.6 | 17.3 | 51.4 |
| W. E. Greiner | 6.8 | 25.0 | 0 | 6.6 | 62.4 | 45.8 | 100.0 | 60.0 |
| R. T. Hill | 10.8 | 48.6 | 65.3 | 21.0 | 74.3 | 48.6 | 34.6 | 76.0 |
| J. B. Hood | 23.0 | 56.7 | 60.3 | 49.4 | 71.9 | 40.2 | 38.0 | 46.7 |
| J. L. Long | 14.7 | 25.5 | 40.9 | 24.1 | 71.6 | 58.3 | 36.3 | 60.5 |
| T. C. Marsh | 17.4 | 80.0 | 88.3 | 60.3 | 80.7 | 20.0 | 11.6 | 38.0 |
| T. J. Rusk | 21.5 | 25.5 | 60.0 | 26.0 | 27.2 | 27.6 | 20.0 | 20.1 |
| Rylie | 1.0 | 0 | 0 | 5.6 | 95.0 | 81.8 | 100.0 | 84.9 |
| L. V. Stockard | 2.3 | 2.2 | 0 | 4.6 | 71.8 | 70.1 | 100.0 | 69.8 |
| E. D. Walker | 18.7 | 66.1 | 71.4 | 50.6 | 80.1 | 30.6 | 14.2 | 46.7 |

This data relating to the schools in which white students outnumber black students reveals there is an even greater general disproportion as to the frequency of suspensions and the incidents of corporal punishment among blacks than whites than exists in all the schools.

While the statistical data alone reveals there is a significant disparity in suspension and corporal punishment statis-

6. Suspension and corporal punishment statistics taken from Pl.Ex. 2 and computed as a percentage of total suspensions or incidents of corporal punishment. Enrollment percentages are derived from Pl.Ex. 1 as to entire school enrollment.

tics as applied to black and white students, an expert on statistical analysis, Dr. Scott Kestler,[7] conducted an extensive analysis by using a method termed the Chi Square formula to determine whether the frequency of suspension of black students over white students is significantly different from their racial composition. (Pl.Ex. 8).

$$\text{Chi Square} = \frac{(BS-ES)}{ES} + \frac{(WS-ES)}{ES}$$

$BS =$ Actual number of suspensions of Black students

$WS =$ Actual number of suspensions of White students

$ES =$ Estimated frequency of suspensions computed on basis of racial composition of enrollment.

From the enrollment statistics Dr. Kestler computed the proportion of suspensions that would have been expected. From a standardized table of Chi Square values he then selected a Chi Square that would not result in a significantly different proportion of black and white students disciplined. He then obtained the Chi Square from the actual enrollment and suspension statistics.

His calculations resulted in the following conclusions: (Pl.Ex. 9).

(1) Black students *are* being suspended from school significantly more frequently than are White students.

(2) Black students *are* being suspended from elementary schools significantly more frequently than are White students.

(3) Black students *are* being suspended from junior high schools significantly more frequently than are White students.

(4) Black students *are* being suspended from senior high schools significantly more frequently than are White students.

(5) Black students receive "more-than-3-day" suspensions significantly more frequently than do White students.

Dr. Kestler put into graphic form his suspension and enrollment calculation in Pl.Ex. 10, 11, 12, 13 and 14. His conclusions confirm the statistical data furnished by DISD.

Having determined there is a significant disparity between the blacks and whites disciplined, it now becomes necessary to determine the reasons for this disproportion. An examination of suspension and corporal punishment data for the years 1972–73 and the first half of 1973–74 shows that 60% were for such offenses as truancy, class cutting, talking back to the teacher, or other non-violent conduct.

As a part of his investigation Dr. Kestler visited six schools where white students outnumber black students. It was his conclusion from his visits and his calculations that the DISD applied discipline in a racially biased manner. Dr. Kestler noted there was a substantial reliance upon non-violent "offenses" as a justification for suspension when, in fact, such conduct may be a pivotal ethnic characteristic. The primary reasons, he said, for student suspension are ones that are highly susceptible of selective perception and selective prosecution.

Dr. Kestler additionally concluded there were two possible reasons for the disproportionate student suspension and corporal punishment statistics. One reason was racial bias in the administration of the student discipline procedures and policies, a factor that Dr. Kestler said definitely existed within the DISD. The second reason was increased "suspendable conduct" on the part of black students.

Dr. Reuben McDaniel,[8] an expert on institutional racism, concluded from his

7. Dr. Kestler was qualified as an expert in educational psychology who was also qualified as an expert in statistical evaluation of educational programs. Dr. Kestler also had extensive experience in the use of statistical analysis to determine whether cultural or racial bias exists in various program operations.

8. Dr. McDaniel qualified as an expert with respect to institutional racism within the educational system having studied 1,163 educa-

examination of Dr. Kestler's data that the DISD fit into an existing national pattern of race discrimination in that the DISD is a "white controlled institution" with "institutional racism" existing in the operation of its discipline procedures. A "white controlled institution" occurs, testified Dr. McDaniel, when a large majority of the decisions about resource distribution is made by white administrators. "Institutional racism" exists, according to Dr. McDaniel, when the standard operating procedures of an institution are prejudiced against, derogatory to, or unresponsive to the needs of a particular racial group. This is distinguished from "personal racism" which exists within a given individual and do not become involved in the administration of an institution's normal operations.

Because of the existence of racism, Dr. McDaniel concluded black students will become more frustrated as the institution continues to refuse to respond to their needs and ambitions. This frustration will be reflected either in increased passivity or increased hostility. Such hostilities will result in increased "suspendable behavior", a term used by Dr. Kestler as one of the causes for the disproportionate suspension ratios. Moreover, Dr. McDaniel concludes, in a school district in which there is institutional racism toward the Blacks conduct by black students that would not be "unusual" or "offensive" in a black environment becomes to many teachers "disruptive" or "suspendable conduct." To teachers unfamiliar with Blacks, this conduct, that is non-violent and characteristic of the black race, stands out and becomes thereby subject to selective prosecution. For example, Dr. McDaniel, himself a Black, testified that among Blacks there is substantial physical contact. To a teacher unfamiliar with the subtle nuances of this type of conduct, a touch or slap by one black

student on another black student may be interpreted as a hostile act when in fact it was a friendly act. Therefore, this teacher may recommend disciplinary action when it is unjustified.

In conclusion, Dr. McDaniel testified that to parents and students within the DISD based on Dr. Kestler's statistical analysis the DISD would be perceived as a racial institution.

Two parents also testified at the permanent injunction hearing.[9] From their testimony, two facts emerge. First, the reaction anticipated by Dr. McDaniel by students to white institutional racism was manifest in the children of these parents. Mrs. Porter testified that after her daughter was transferred to a predominately white school she developed discipline problems that resulted in several suspensions, mostly for tardiness and class cutting. Mrs. Porter's second daughter, Maurine, reacted differently when assigned to a predominately white junior high school. Maurine became depressed and quiet. A third daughter, Laurene, developed a change of attitude and became very hostile toward school when she was assigned to a predominately white institution.

Mrs. Hawkins testified as to similar problems with her son, Delbert, the named plaintiff.

One of the most damaging witnesses to the defendant was Dr. Nolan Estes, superintendent of the DISD, called by the plaintiffs. Asked if he was aware of anything to which he could "attribute the high number of suspensions of Blacks over Whites", he replied, "Well, we are a White controlled institution, institutional racism, racism among individuals." Later on in his testimony he admitted again that white institutional racism existed in the Dallas Schools. In response to questioning about whether he had ever before stated this he replied that he had "before our

tional institutions in 50 states. Dr. McDaniel has also drafted programs specially designed to eliminate such institutional racism.

9. The two parents were Mrs. Odessa Porter and Mrs. Ruth Hawkins. Each parent has children enrolled in the DISD. Each experienced student-teacher tension.

principals' group," which was not an open public meeting.

The defendants presented no evidence to rebut the testimony of Dr. Kestler, Dr. McDaniel or Dr. Estes that racism exists within the DISD and contributes to the suspension of black students.

In order to overcome the problem of racism Dr. McDaniel testified that there was a need for the school district to be responsive to the needs of black students. Such institutions, he said, had done things on four essential levels. "First, they had acted in terms of institutional and structural changes. Secondly, they had reacted in terms of training of teachers and counselors. Thirdly, they reacted in terms of the training of students to deal with institutionalized racism. Fourth, they had been active in terms of their community or their environment in attempting to push programs of affirmative action."

In response to questioning by counsel for both plaintiffs and defendants he gave numerous examples of the changes that were necessary. He pointed out that institutions must hold personnel accountable for decreasing racism and the ability of teachers to deal with the situation should be a criterion for promotion and pay raises. With reference to training, he pointed out programs need to be lengthy and intensive with continuity rather than "one-shot-single-topic kind of programs." Such training, he said, must involve not only the administrator "going to a special class _ _ _ , but actual interaction while the teacher is performing his role _ _ _ in class." He emphasized the necessity of training in human relations must include information which makes administrators and teachers understand their own feelings and reactions toward minority students. Also teachers should have a cultural awareness of Black people which is frequently not appreciated by Whites. One characteristic, for example, of Blacks, Dr. McDaniel mentioned, was the importance of the extended family and their practice of calling other Blacks "brother and sister" as well as "uncle and aunt", persons to whom they are not related.

At the same time that teachers are being trained in ways to decrease racism, students, he said, need to learn "to manage their way through the racist institution." Racism will not be overcome quickly and in the meantime Blacks must be taught to live in a white dominated society.

With regard to a community program, he urged that the schools be active, working with groups to develop a better understanding of community problems. The institution should not simply "mirror the community."

These programs Dr. McDaniel maintained would "resolve conflict and ease tensions within the school system."

The programs initiated by the DISD since the desegregation order and testified to by Dr. Estes, while as a whole aimed at the elimination of cultural and institutional racism over a prolonged period, do not deal with the immediate problems of DISD. Moreover, they are presented to administrative and supervisory personnel rather than to teachers.

Defendants offered no evidence to establish that any administrator is currently assigned the responsibility of implementing a remedy that will eliminate the current racial application of the suspension policies. Although Dr. Estes and other DISD administrators and officials have been aware of the problem since the compilation of the 1971–72 school year suspension statistics, no affirmative countervailing action has been taken. All of the DISD programs are "long term" permitting the continued discrimination to exist for an indefinite period.

■ It is apparent that the program thus far in effect in the DISD has not worked to materially change the existing racism which, in the opinion of this Court, is the chief cause of the disproportionate number of Blacks being suspended and given corporal punishment.

An improvement in the situation demands an affirmative program. Such a program should include the four levels outlined by Dr. McDaniel, as heretofore discussed.

This Court will not detail such a program as the Court has no intention of taking from the School Board or the Superintendent and other officials the running of the schools.

It should be pointed out, however, that if there is to be progress in Dallas towards removing institutional racism there must be a change in attitude of both the School Board and the officials. There has prevailed among these officials a determination to resist every effort to make the changes which have been decreed and which they should know are inevitable. The law will be followed, says the School Board, but then only after every effort has been made to resist. There has been an utter lack of leadership in developing public opinion to accept necessary changes in the school if the law is to be followed.

Cooperation on the part of the school officials with the public generally, and particularly the parents, is needed at the same time changes are made in the school system. It is the responsibility of the School Board and officials to take the lead in the development of public opinion and in obtaining cooperation.

No court can decree a change in attitude. That is something within the individual. Put briefly, there must be a real effort on the part of everyone involved to accentuate the positive while at the same time eliminating the negative effects of "white institutional racism". As a beginning, the School Board and DISD officials could meet with the Tri Ethnic Committee, which has already voiced its concern over the disporportionate suspension and corporal punishment statistics in Report No. 14 of the Tri Ethnic Committee filed May 13, 1974, in Tasby v. Estes, *supra*. Such a conference should be, however, only the beginning.

While not attempting to dictate the details of an affirmative program this Court does direct the DISD to review its present program and to put into effect an affirmative program aimed at materially lessening "white institutional racism" in the DISD.