**Eddie Mitchell TASBY et al.,
Plaintiff-Appellants,**

v.

**Nolan ESTES et al., Defendant-Appellees (two cases).**

**Eddie Mitchell TASBY et al.,
Plaintiffs-Appellants-Cross-Appellees,**

v.

**Nolan ESTES et al.,
Defendants-Appellees-Cross-Appellants.**

**Nos. 72–1381, 71–2184, 71–2581.**

United States Court of Appeals,
Fifth Circuit.

July 23, 1975.

Certiorari Denied Nov. 3, 1975.
See 96 S.Ct. 299.

---

**5.** *See* n. 4 *supra*.

Douglas R. Larson, Edward B. Cloutman, III, Cleophas R. Steele and George Martinez, Dallas Legal Services Project, Sylvia M. Demarest, Dallas, Tex., Mario G. Obledo and Ed Idar, Jr., Mexican-American Legal Defense, San Antonio, Tex., Melvyn R. Leventhal, Jackson, Miss., John E. Serna, San Antonio, Tex., for Eddie Mitchell Tasby and others.

Warren Whitham, Franklin E. Spafford, Mark Martin, Dallas, Tex., for defendant-appellees.

Lee Smith, William C. Dowdy, Jr., Dallas, Tex., for intervenor Donald E. Curry.

James G. Vetter, Jr., Dallas, Tex., for intervenors Citizens of Oak Cliff.

Edwin L. Davis, Dallas, Tex., for intervenor Herman Bond.

N. Alex Bickley, City Atty., Dallas, Tex., for intervenor City of Dallas.

David M. Kendall, Jr., Dallas, Tex., for intervenors Greater Dallas Council of Citizens for Neighborhood Schools.

W. Ted Minick, Dallas, Tex., for intervenor James T. Maxwell.

Larry F. Amerine, James C. Barber, Earl Luna, Dallas, Tex., Kenneth Vaughan, Garland, Tex., amicus curiae for Garland Ind. School Dist.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

These three consolidated appeals require us to evaluate the progress of the Dallas Independent School District (DISD) in eliminating the vestiges of the dual educational system formerly mandated by Texas law. In this task we are guided principally by the teachings of the United States Supreme Court in *Swann v. Charlotte-Mecklenburg Board of Education,* 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, subsequent Supreme Court decisions, and several of our own decisions, including *United States v. Texas Education Agency,* 5 Cir. 1972, 467 F.2d 848 (motion for clarification denied, 1973, 470 F.2d 1001); *Cisneros v. Corpus Christi Independent School District,* 5 Cir. 1972, 467 F.2d 142, cert. denied 1973, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044 and 1973, 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041, reh. denied, 1973, 414 U.S. 881, 94 S.Ct. 31, 38 L.Ed.2d 129; *United States v. Hinds County School Board,* 5 Cir. 1970, 433

F.2d 611; *Singleton v. Jackson Municipal Separate School District,* 5 Cir. 1970, 419 F.2d 1211. For the reasons given below, we hold that the measures taken by the district court in the areas of student assignment and site selection and school construction to transform the DISD into a unitary system are inadequate to right the constitutional wrong denounced by the Supreme Court in *Brown v. Board of Education,* 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.

## STATISTICAL AND PHYSICAL CHARACTERISTICS OF THE DISD

The DISD is the eighth largest urban school district in the United States. It covers an area of approximately 351 square miles and enrolls some 180,000 students. The DISD operates 180 separate academic campuses, had in 1971 a total annual budget in excess of $150,000,000 and an annual operating budget of $106,500,000. The boundaries of the DISD are not coterminous with those of the City of Dallas. According to the 1970 census, over 800,000 people reside within the corporate limits of the City of Dallas and more than 1,000,000 people live in the Dallas metropolitan area. A number of independent school districts (ISD's) are situated in Dallas County in addition to the DISD, including one (Highland Park) located in the City of Dallas and surrounded on all sides by the DISD.

## THE PREVIOUS DESEGREGATION SUIT AGAINST THE DISD

The DISD is no stranger to school desegregation proceedings before this court. Following the Supreme Court's decisions in *Brown I,* supra, and *Brown II,* 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, an action was brought in July, 1955, by black children and parents to desegregate the facilities of the DISD. In *Brown v. Rippy,* 5 Cir. 1956, 233 F.2d 796, cert. denied 1956, 352 U.S. 878, 77 S.Ct. 99, 1 L.Ed.2d 79, we reversed an order of the district court dismissing the suit as premature. The following year, in *Borders v. Rippy,* 5 Cir. 1957, 247 F.2d 268, we set aside an order of the district court dismissing the suit for failure of the plaintiffs to exhaust their state administrative remedies. Again in 1957, we set aside a district court order because that court had rather petulantly directed immediate massive desegregation of the DISD without holding hearings, making findings, and directing submission of a plan. *Rippy v. Borders,* 5 Cir. 1957, 250 F.2d 690.

We next dealt with the DISD's desegregation difficulties in 1960 in *Boson v. Rippy,* 5 Cir. 1960, 275 F.2d 850, once more holding the district court in error for not requiring the DISD to submit a desegregation plan. That same year, in *Boson v. Rippy,* 5 Cir. 1960, 285 F.2d 43, we ordered the district court to require the DISD to adopt a "stair-step" plan of desegregation under which one grade per year would be removed from the dual educational structure and administered in a unitary fashion. Such a plan was put into effect. In 1965, however, we found it necessary twice to order the DISD to desegregate the twelfth grade no later than September of that year. *Britton v. Folsom,* 5 Cir. 1965, 348 F.2d 158; *Britton v. Folsom,* 5 Cir. 1965, 350 F.2d 1022.

The "stair-step" desegregation process we directed in 1960 and implemented by the DISD the following year merely involved the elimination of racial criteria for the admission of students to the DISD's schools. The DISD was not directed to take affirmative action to remove the vestiges of its formerly statutorily-required dual education system through such techniques as "freedom-of-choice", "pairing", or "majority-to-minority transfer program". In fact the DISD took no further steps to eliminate the traces of segregation than required to do by the terms of our 1965 desegregation order.

## THE INSTITUTION OF THE PRESENT DESEGREGATION SUIT

The DISD, on October 6, 1970, was named as a party defendant in an action

brought by the present plaintiffs, who claimed to represent classes of black and Mexican-American students and parents, requesting the desegregation of the DISD in accordance with post-1965 decisional law. The complaint alleged (without denial on the part of the DISD) that:

(a) 71 of the DISD's 180 schools were 90% or greater white.[1]

(b) 40 of the DISD's schools were 90% or greater black.

(c) 49 of the DISD's schools' student populations were 90% or greater of minority races (i. e., black and Mexican-American combined).

(d) 91.7% of all black students in the DISD attended schools in which the student body was composed of 90% or greater minority racial makeup.

(e) Less than 3% of all black students in the DISD attended elementary or secondary schools in which the majority of the student body was white.

(f) Only 2% of black elementary students in the DISD attended schools in which the majority of the student body was white.

(g) Of the 37 new schools constructed, or those to which additions had been made, between 1965 and 1970, 34 had student enrollments 90% or greater black, 90% or greater minority (black and Mexican-American), or 90% or greater white.[2]

The plaintiffs asked the district court for the following relief:

(a) Meaningful desegregation of the DISD.

(b) Assignment of faculty members to each DISD school in proportion to the racial composition of the entire student body of the DISD.

(c) Halting of all site acquisition and school construction activities which would have the effect of increasing or continuing segregation by race within the DISD.

(d) The adoption of policies designed to lower the high drop-out rate among Mexican-American students in the DISD.

### THE PRE–TRIAL POSITION OF THE DISD

The DISD moved for summary judgment with respect to two matters: (1) it asserted that since the prior school desegregation proceedings were still pending in the district court the present plaintiffs were barred from maintaining this action; and (2) it maintained that a school desegregation suit could not be maintained on behalf of Mexican-American students or parents, since such persons were not recognized as a separate racial class. Eventually, both motions were denied by the court below.

Prior to the trial the DISD had steadfastly maintained that all its policies and practices were in full compliance with the 1965 desegregation order entered pursuant to *Britton v. Folsom I and II*, supra, and that no further changes in those policies and practices were required. In addition, DISD asserted that changes in residential patterns in the geographical area covered by the DISD were responsible for the emergence of essentially one-race or minority schools.

### THE PRE–TRIAL SCHOOL CONSTRUCTION DISPUTE

On October 6, 1970, the day the complaint was filed, the plaintiffs moved for

---

1. For purposes of convenience, throughout this opinion we use the term "white" in the frame of reference used in the pleadings and proceedings below. "White" refers to Caucasian students with Anglo-Saxon (or other non-Spanish surnames) and presumed racial origin. The term is concededly only broadly accurate as applied. For instance, if Juan Garcia married Mary Smith, their offspring would be classified as Mexican-American. On the other hand, if Mary Smith's brother John Smith married Juan Garcia's sister Maria Garcia, their offspring would be classified "white" or "Anglo".

2. The racial composition of the DISD student body during the 1971–1972 academic year was approximately 69% white, 32% black and 8% Mexican-American.

a preliminary injunction seeking relief against current and future school construction and against further use of the neighborhood pupil assignment system. On November 24, 1970, the district court held a hearing limited to the school construction question and denied all injunctive relief in this respect to the plaintiffs, who appealed to this court from such denial. On June 3, 1971, this panel vacated the judgment of the district court and remanded the matter for further proceedings in accordance with *Swann,* supra. *Tasby v. Estes,* 5 Cir. 1971, 444 F.2d 124.

Following our remand the district court after an evidentiary hearing enjoined future construction activities pending trial of the entire case with the exception of two elementary schools which were being built in black neighborhoods, Jackson and Young elementary schools. The plaintiffs' appeal from the district court's refusal to enjoin further work on those two schools is # 71–2184.

### TRIAL AND JUDGMENT IN THE DISTRICT COURT

On July 12, 1971, trial began in the district court limited to the single issue of whether the DISD was in compliance with the law. DISD's counsel in opening argument abandoned his previous claim of total compliance and indicated for the first time that the DISD would not oppose faculty desegregation, implementation of a majority-to-minority transfer policy, and the appointment of a bi-racial committee. The DISD's counsel, however, adhered to the position that the DISD's student assignment and school construction policies and practices were in compliance with the law.

At the completion of the trial on July 16, 1971, the district judge issued a memorandum opinion, N.D.Tex.1971, 342 F.Supp. 945, setting forth his factual findings and legal conclusions. With respect to the existence of vestiges of the dual educational system, the opinion noted:

"When it appears as it clearly does from the evidence in this case that in the Dallas Independent School District 70 schools are 90% or more white (Anglo), 40 schools are 90% or more black, and 49 schools with 90% or more minority, 91% of black students in 90% or more of the minority schools, 3% of the black students attend schools in which the majority is white or Anglo, it would be less than honest for me to say or to hold that all vestiges of a dual system have been eliminated in the Dallas Independent School District, and I find and hold that elements of a dual system still remain.

"The School Board has asserted that some of the all black schools have come about as a result of changes in the neighborhood patterns but this fails to account for many others that remain as segregated schools. The defendant School Board has also defended on the ground that it is following a 1965 Court order. This position is untenable."

Addressing itself to the impact of post-1965 developments in the law of public school desegregation, the district court observed:

"There have been too many changes in the law even in the Fifth Circuit and it is fairly obvious to me that the defendant School Board and its administration have been as aware of them as I. For example, the case of *Singleton v. Jackson Municipal Separate School District* [419 F.2d 1211] was handed down in December of 1969. This was the case in which the Court ordered, among other things, desegregation of faculty and other staff, majority to minority transfer policy, transportation, an order with reference to school construction and site selection, the appointment of bi-racial committees. The Dallas School Board has failed to implement any of these tools or to even suggest that it would consider such plans until long after the filing of this suit and in part after the commencement of this trial."

The district court dealt with the status of Mexican-Americans for purposes of

public school desegregation in the following manner:

"It is my opinion and I so hold that Mexican-Americans constitute a clearly separate and clearly identifiable ethnic group. No one ever had any doubt about Lee Trevino's ethnic origin and this is true of many, many others. But as was said by Judge Jack Roberts of the Federal Court in Austin, 'But the mere existence of an ethnic group, regardless of its racial origin, and standing alone, does not establish a case integrating it with the remainder of the school population. Rather, the plaintiff must show that there has been some form of de jure segregation against the ethnic minority.' And I find that the plaintiff Mexican-Americans have failed in maintaining the burden of proof. I would point out, however, that this particular ruling may not be too significant in the light of what I propose to do in this regard and that is that any plan or remedy must take the Mexican-American into consideration and there will be the appointment of a tri-ethnic committee as distinguished from a bi-racial advisory committee. . . ."

### THE DISTRICT COURT'S REMEDIAL MEASURES

The district court's opinion-order of July 16, 1971, 342 F.Supp. 945, included a directive to the DISD that it submit a plan for the establishment of a unitary school system by July 23, 1971. The court below gave the DISD some idea of the type of plan it had in mind by means of the following language:

"Now all of this is not as grim as it sounds. I am opposed to and do not believe in massive cross-town bussing of students for the sole purpose of mixing bodies. I doubt that there is a Federal Judge anywhere that would advocate that type of integration as distinguished from desegregation. There are many many other tools at the command of the School Board and I would direct its attention to part of

one of the plans suggested by TEDTAC (Texas Education Desegregation Technical Assistance Center) which proposed the use of television in the elementary grades and the transfer of classes on occasion by bus during school hours in order to enable the different ethnic groups to communicate. How better could lines of communication be established than by saying, 'I saw you on TV yesterday,' and, besides that, a television is much cheaper than bussing and a lot faster and safer. This is in no sense a Court order but is merely something that the Board might consider."

On July 23, 1971, the plaintiffs and the defendant filed their respective plans with the court. The plaintiffs' plan was, in all practical respects, similar to the one devised by the TEDTAC staff and which called for the "clustering" and "satelliting" of school attendance zones, along with the utilization of bus transportation of students on a large scale. The DISD submitted an elementary school plan which was essentially similar to the so-called "television plan" developed by Mr. Pete Williams of TEDTAC and mentioned by the district court in its memorandum of July 16, 1971, 342 F.Supp. 945. With respect to secondary schools, the DISD proposed a plan which involved the transportation of some black students from the inner city to outlying schools and which was designed to reduce the percentage of minority students in all schools below the 90% level.

Following the submission of the two plans, the district court directed the parties and several intervenors to meet with him in an effort to arrive at a resolution of the differences in the plans. Four days of negotiations proved unavailing and trial was resumed on July 27, 1971, continuing through July 30, 1971.

The district court entered its judgment on August 2, 1971. With respect to the DISD's elementary schools, the trial court ordered the adoption of the "television plan", the pertinent portions of which follow:

"A. To establish a clustering of present elementary attendance zones in such a manner as to group those elementary schools together that would provide an approximate 2:1 ratio of Anglo *classrooms* to minority *classrooms*.

"B. To assign those elementary students residing in the elementary zones for the 1970–71 (sic) school year to the same neighborhood elementary school which served that zone in 1970–71 (except for those elementary schools which upon recommendation of the School Board are closed by this order). Schools which are to be closed are:

> Vickery
> Stephen J. Hay
> Letot

and the students in Vickery are assigned to Hodgkiss, in Stephen J. Hay to Sam Houston, and in Letot to Burnett.

"C. To establish elementary class schedules and courses of study so as to provide each elementary student with a daily minimum of one hour of contact with students of another race. Such contact shall be a simultaneous two-way oral and visual communication via television cable between two or more schools; classrooms of each such elementary school shall be identifiably paired in such a manner so that approximately two Anglo classrooms are paired with one minority classroom for the entire academic year. It is contemplated that from two to seven studio classrooms will be established at each elementary school.

Such studio rooms shall be equipped so as to provide the teacher and students seated therein the ability to see and hear the students and teachers in the other paired classrooms who will also be seated in studio rooms at their schools.

The electronic cable necessary to effectuate this order shall be leased or installed between the elementary schools along with such other equipment (including channel modulators)

as shall be deemed most engineeringly feasible to provide the simultaneous two-way oral and visual contact required above.

"D. To provide at least one weekly visit of an educational nature and during regular school hours between the two or more paired classrooms that daily communicate with each other. Such visit shall provide not less than three hours of personal contact between the paired classrooms. Transportation for purposes of implementing this portion of the elementary assignment plan shall be provided forthwith by leasing companies. . . ."

The district court's judgment in dealing with student assignments in the DISD's secondary schools, increased the number of students to be "satellited" over the number envisioned in the DISD's plan and "paired" certain secondary facilities in the Oak Cliff area of Dallas (located south of the Trinity River, in the southwest portion of the City).

In addition to specifying changes in student assignments, the district court ordered:

(a) The desegregation of the faculty and staff of the DISD according to the formula mandated in *Singleton v. Jackson Municipal Separate School District*, 5 Cir. 1969, 419 F.2d 1211, 1217–18, reversed and remanded in part on other grounds, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477, provided, however, that a 10% variance, above and below, in each school would be permitted.

(b) The implementation of a secondary school majority-to-minority transfer program with the incentive of a four-day school week for participating students.

(c) The appointment of a Tri-Ethnic Committee to advise the DISD on desegregation matters.

(d) The adoption of a site selection and school construction policy de-

signed to prevent the recurrence of a dual school structure.[3]

(e) The submission to the district court by the DISD of desegregation reports on November 1, 1971, on April 15, 1972, and annually thereafter.

The "pairing" provisions dealing with the Oak Cliff area touched off a public furor and on August 9, 1971, the district judge stayed the effect of his August 2, 1971 judgment dealing with assignments to secondary schools in the DISD. The stay order authorized the DISD to reassign the students in the affected "satellite" areas. On August 12, 1971, the DISD submitted a secondary school student assignment plan virtually identical to the Board's original plan (filed on July 23, 1971) and the district court, in an ex parte proceeding, approved that plan. That court on August 17, 1971, released a "Supplemental Opinion Regarding Partial Stay of Desegregation Order" explaining the reasons for its stay of the secondary student assignment portion of its August 2, 1971 judgment until at least January 10, 1972. This opinion asserted that the secondary school student assignment provisions would have disrupted the educational process for the students involved and would have placed an unfair transportation burden upon black students involved in the "satelliting" operation. Although the secondary student assignment provisions of the August 2, 1971 judgment were ordered stayed until January 10, 1972, the language of the August 17, 1971 opinion indicates that the stay is intended to be permanent.

In summary, the district court dealt with the student assignment aspects of desegregation in two ways: (1) the adoption of the "television plan", and (2) the adoption of the DISD's minimal "satelliting" plan.

While the DISD was successfully obtaining a stay of the district court's secondary student assignment provisions, the plaintiffs were attempting to have the implementation of the elementary "television plan" delayed. On August 9, 1971, the plaintiffs moved the lower court to stay implementation of the "television plan" (which the district court had directed to be operational, if possible, no later than February 1, 1972). The motion for stay was denied the following day. On August 19, 1971 the plaintiffs petitioned this Court pursuant to Rule 8 F.R.A.P. for a stay of the implementation of the "television plan" for the DISD elementary schools. The plaintiffs estimated that the "television plan" would cost at least ten million dollars to install. The following day, August 20, 1971, this panel granted the motion for stay and enjoined the DISD from taking any further steps to implement the "television plan" pending final disposition of an appeal of the district court's desegregation judgment.

During the period in which the district court was considering an appropriate remedial order for the DISD, numerous individuals, groups and Independent School Districts were permitted to intervene in the proceeding. These intervenors directed most of their arguments to a proposal, advanced after entry of the district court's August 2, 1971, judgment that a desegregation plan for the entire Dallas metropolitan area involving numerous independent school districts be devised, thereby spreading the impact of desegregation as widely as possible.

We heard these appeals December 2, 1971, at Houston, Texas. During oral argument, in addition to the parties, these intervenors and several amici curiae were heard. The appeal from the district court's final school desegregation order is before us as # 71–2581.

3. The School Construction and Site Selection portion of the August 2, 1971, order read as follows:

"To consult with and get the approval of the Tri-Ethnic Committee before beginning construction on any school facility or selecting future school sites. Further, all school construction and site selection, including the location of any temporary classrooms in the system shall be done in a matter (sic) that will prevent the recurrence of a dual school structure, once this plan is implemented."

## THE SECOND SCHOOL CONSTRUC-
## TION DISPUTE

At a time subsequent to the entry of the August 2, 1971, desegregation order of the district court, the DISD requested the approval of the Tri-Ethnic Committee with respect to certain site acquisitions, renovations, and new construction projects. On February 7, 1972, the Tri-Ethnic Committee advised the district court that it would not approve any site acquisitions or construction projects until the Court of Appeals had rendered its decision in # 71–2581. The DISD then directed its attorneys to seek the approval of the district court for the initiation of the disputed projects. The plaintiffs learned of DISD's intentions and on February 10, 1972, moved in the district court for an injunction against several of the construction and acquisition projects, no objections being voiced as to the remainder. The primary basis for this motion was an assertion that named projects would result in further segregation of the races within the DISD, in violation of applicable law.

The district court took up these matters on February 16, 1972. Dr. Nolan Estes, General Superintendent of the DISD, testified, with regard to the establishment of an attendance zone for a new school in a predominantly Mexican-American residential area, as follows under cross-examination by plaintiffs' counsel, Mr. Cloutman:

Q: Did the School District offer any of its other considerations in lieu of considering race as a primary factor in designing that new attendance zone?

A: We used the six criteria that were established for developing school attendance zones, one of which, of course, was race. The others, including geographical location, natural barriers, and instructional program, the distance traveled. After considering all of these, including race, it was felt that the present attendance zones as established by the Court on August 2nd for Benito Juarez and Fred Douglass were the ones that were most

sound educationally and the ones that were most feasible administratively.

Q: Now, if I remember your testimony at trial on this case, there were, at least five or six criteria then used, or used prior to trial to consider new construction and as I recall race was not one of them?

A: That is right.

Q: You have added race?

A: Yes, sir.

Q: Is race given an overriding consideration over all those other factors?

A: Race is one of the six criteria that we use in establishing attendance zones.

Q: My question calls for a "yes" or "no" answer, Dr. Estes. Was race given an overriding consideration over all those other factors, "yes" or "no".

(Counsel for defendants objects; objection overruled.)

A: Well, the overriding consideration was providing facilities for those students in the attendance zones as established by the Court order on August 2nd.

[Pages 54–56, Transcript of Proceedings, No. CA–3–4311–C.]

At the conclusion of the hearing, the lower court denied the plaintiffs' motion for injunctive relief and gave its approval for the DISD to proceed with the contested projects. The plaintiffs again sought relief under Rule 8, F.R.A.P. from us. On February 22, 1972, we enjoined the DISD pending our disposition of the appeal from proceeding with seven (7) site acquisition, renovation or construction projects. The plaintiffs' appeal from the denial of injunctive relief in this respect is before us as # 72–1381.

## THE APPELLATE CONTENTIONS
## OF THE PARTIES

The plaintiffs advance the following arguments in this Court:

(a) The elementary "television plan" adopted below is constitutionally inadequate.

(b) The district court erred in adopting the DISD's inadequate secondary student assignment plan.

(c) The district court, as to site acquisition and school construction, has failed to abide by its own judgment of August 2, 1971, and the controlling principles of constitutional law.

(d) While the trial court was correct in treating Mexican-Americans as a distinct ethnic group for desegregation purposes, that court erred in holding that the plaintiffs had √failed to prove the existence of de jure discrimination in public education against that group on the part of the DISD.

(e) The district court erred in ordering the DISD to submit desegregation progress reports on an annual basis after April 15, 1972, rather than semiannually.

(f) The 10% variation in the racial compositions of faculty staff authorized by the district court constitutes an impermissible deviation from the *Singleton* requirement.

The DISD advances the following contentions:

(a) The elementary "television plan" is constitutionally permissible and highly feasible.

(b) The district court acted properly in adopting the secondary student assignment plan proposed by the DISD; but, if the district court intends to put into effect its original secondary student assignment scheme once the stay expires, it acted improperly.

(c) The district court properly refused the plaintiffs' requests for injunctive relief in # 71–2184 and # 72–1381 regarding site acquisition and school construction.

(d) The district court erred in treating Mexican-Americans as a distinct ethnic grouping for public school desegregation purposes but correctly held that the Mexican-American plaintiffs in this case had failed to sustain their evidentiary burden with regard to de jure discrimination.

(e) The district court's reporting requirements are in accordance with controlling decisions of this Court.

(f) The district court's faculty and staff desegregation order complies with this Court's mandate in *Singleton,* supra.

Intervenors Oak Cliff Citizens take issue with the desegregation order entered below for the following reasons:

(a) The district court's secondary student assignment plan, which ordered pairing of schools in the Oak Cliff section of Dallas and which was later stayed until at least January 10, 1972, places a disproportionate desegregation burden upon the Oak Cliff section when compared to the desegregation impact projected for most other white sections of the City.

(b) The district court failed to appoint a proportionate number of representatives from the Oak Cliff section to the Tri-Ethnic Committee established by the judgment of August 2, 1971.

(c) The district court erred in not affording the Oak Cliff section's representatives an opportunity to review its desegregation plan before ordering it into effect.

Intervenors Donald G. Curry and others, residents of recently developed residential areas in the northern portion of the DISD, argue in this Court that any desegregation plan eventually promulgated for the DISD should not apply to their areas because these areas were undeveloped at the time of the *Brown* decisions of the Supreme Court and because these areas could not possibly be tainted with the remnants of the dual school system.

Intervenors Herman Bond and others propose that we remand this cause with directions to join as parties defendant all the independent school districts adjacent to the DISD and to formulate a public

school desegregation plan which would spread the impact of the creation of a unitary system as widely as possible throughout the Dallas metropolitan area. These intervenors ask also for a remand to the district court with directions to establish north-south school attendance zone boundaries within the City of Dallas as a means of preventing resegregation "south of the river".

Several independent school districts in the Dallas metropolitan area, in response to the Herman Bond group's suggestion of a desegregation plan for the entire metropolitan area, urge that the adjacent independent school districts have complied fully with federal court orders to desegregate their facilities and that they should not be compelled to participate in the desegregation of the DISD.[4]

## THE CONSTITUTIONALITY OF THE ELEMENTARY "TELEVISION" PLAN

 In ordering the adoption of the elementary school "television plan", the district court's primary objective was adherence to the "neighborhood school" concept of student assignment. It is undisputed that the "television plan" would not have altered the racial characteristics of the schools operated by the DISD. The Supreme Court has made it clear that nothing less than the elimination of predominantly one-race schools is constitutionally required in the disestablishment of a dual school system based upon segregation of the races. For this reason, the district court's elementary school "television plan" must be rejected as a legitimate technique for the conversion of the DISD from a dual to a unitary educational system.

In *Green v. County School Board of New Kent County, Virginia*, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, the Court held that a "freedom of choice" plan did not constitute adequate compliance with the school board's responsibility to achieve a system of determining admission to public schools on a nonracial basis. The Supreme Court observed:

"The New Kent School Board's 'freedom-of-choice' plan cannot be accepted as a sufficient step to 'effectuate a transition' to a unitary system. In three years of operation not a single white child has chosen to attend Watkins school and although 115 Negro children enrolled in New Kent School in 1967 (up from 35 in 1965 and 111 in 1966) 85% of the Negro children in the system still attend the all-Negro Watkins school. In other words, the school system remains a dual system. Rather than further the dismantling of the dual system, the plan has operated simply to burden children and their parents with a responsibility which *Brown II* placed squarely on the School Board. The Board must be required to formulate a new plan and, in light of other courses which appear open to the Board, such as zoning, *fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools.*" 391 U.S. at 441–2, 88 S.Ct. at 1696, 20 L.Ed.2d at 725–6 (emphasis added).

We note also the discussion by the Chief Justice of predominantly one-race schools for an unanimous court in *Swann, supra*:

"In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system which still practices segregation by law. The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimina-

---

4. It should be noted at this point that these intervening adjacent ISD's are predominantly white in racial composition. At oral argument it was developed that the high-income, pre- dominantly white Highland Park ISD (entirely surrounded by the DISD) had not intervened in this proceeding.

tion of one-race schools. No *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved; but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools which are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominantly of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part."

402 U.S. at 26, 91 S.Ct. at 1281, 28 L.Ed.2d at 572.

Addressing the sanctity of the "neighborhood school concept", the Chief Justice wrote: "Desegregation plans cannot be limited to the walk-in school". 402 U.S. at 30, 91 S.Ct. at 1283, 28 L.Ed.2d at 575.

The district court's elementary school "television plan" may not be justified because of the Supreme Court's realization that some one-race schools may remain in a school system which has become unitary in character. The "television plan" does not attempt to alter the racial characteristics of the DISD's elementary schools. The plan, although novel in approach, is incompatible with all the jurisprudence of the past twenty years as to public school desegregation, and hence fails to pass muster.

### THE VALIDITY OF THE DISD'S SECONDARY PLAN

As earlier noted the final judgment is ambiguous with respect to the assignment of secondary school students in the DISD: is the district court's order of August 2, 1971 to be stayed permanently or until January 10, 1972? We have no reason to believe that the stay of the August 2, 1971, secondary school provisions has been lifted and assume for present purposes that the plan submitted by the DISD was adopted by the court below as its final remedial measure in this regard.

The DISD's brief establishes that DISD had an extremely limited objective in mind when it submitted its secondary school student assignment plan to the district court on July 23, 1971:

"Under *Swann's* remainder (sic) that courts of equity are at work, certainly equity, fairness and logic would suggest and require that if 90% is a ratio to be used to establish vestiges of a dual school system that less than 90% is a ratio to be used to establish the elimination of vestiges of a dual system."

Main Brief of the DISD, No. 71–2581, App. B, page B–10.

The objective of reducing the proportionate share of a racial group's composition of the student population of a particular school to just below the 90% mark is short of the Supreme Court's standard of conversion from a dual to a unitary system. The 90% figure adverted to by the plaintiffs in this case was clearly utilized only for purposes of emphasis; it was never intended by the plaintiffs to represent the magic level below which a school would no longer be categorized as "one-race". The DISD's approach to the problem of desegregating its secondary schools fails to indicate a *bona fide* effort to comply with the mandates of the Supreme Court. The district court's plan for the desegregation of the DISD's secondary schools must be rejected as constitutionally inadequate.

### THE SITE SELECTION AND SCHOOL CONSTRUCTION CONTROVERSIES

*Swann*, supra, recognized that the selection of sites for new public schools and the abandonment of old facilities

frequently are strong influences in fixing the racial characteristics of schools and neighborhoods. With this in mind, the Supreme Court instructed the district courts and local school authorities in the following manner:

"In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight. In devising remedies where legally imposed segregation has been established, it is the responsibility of local authorities and district courts to see to it that further school construction and abandonment is not used and does not serve to perpetuate or re-establish the dual system. When necessary, district courts should retain jurisdiction to assure that these responsibilities are carried out. Cf. United States v. Board of Public Instruction, 395 F.2d 66 (CA 5, 1968); Brewer v. School Board, 397 F.2d 37 (CA 4, 1968)."
402 U.S. at 21, 91 S.Ct. at 1278–79, 28 L.Ed.2d at 569–70.

We regard as highly relevant to the cases before us the Supreme Court's approving citation of this Court's decision in *United States v. Board of Public Instruction of Polk County, Florida*, 5 Cir. 1968, 395 F.2d 66. *Polk County* involved a suit filed by Negro residents seeking to enjoin the construction of a new grammar school which the plaintiffs contended would increase racial segregation. We held that where the Board of Education had not taken affirmative action to locate the new school in a manner which would assist in the elimination of the vestiges of the old dual school system, new construction in the county would be delayed until that action was taken. Judge Tuttle stated for us:

"The appellee contends that inasmuch as the planning for the school was made without reference to race, there was no conscious effort on the part of the Board to perpetuate the dual school system. This does not meet the requirements of the court order. There is an affirmative duty, overriding all other considerations with respect to the locating of new schools, except where inconsistent with 'proper operation of the school system as a whole' to *seek* means to eradicate the vestiges of the dual system. It is *necessary* to give consideration to the race of the students. It is clear from this record that neither the state board nor the appellee sought to carry out this affirmative obligation, before proceeding with the construction of this already planned school."

395 F.2d 69. (Emphasis in original).

The Fourth Circuit, in *Brewer*, supra, used somewhat different language to convey the same message as our *Polk County* decision. The plaintiffs in *Brewer* challenged on appeal the district court's approval of the construction of a new high school to replace an old all-Negro facility in Norfolk, Virginia. The appellants claimed that the new school location would perpetuate racial segregation in Norfolk. In remanding the matter to the lower court Judge Butzner, for his circuit, said:

"The district judge's approval was based largely on the school board's expertise in site location and the fact that a committee of Negro citizens urged construction near the old school. These factors should be given weight, but they are not controlling. In Wheeler v. Durham City Board of Education, 346 F.2d 768 (4th Cir. 1965), we held that a school construction program is an appropriate matter for court consideration and directed that this be developed upon remand. We will follow the same course here. We do not hold that the new school cannot be built near the old, but many other factors in addition to the site must be considered to determine whether the new school is located to perpetuate segregation. Among these are the new school's attendance area, whether the school will be designed to accommodate only Negroes or whether it will include white pupils who live nearer to it than to the predominantly

white high schools they now attend, whether the racial composition of the faculty will mark it as a Negro school and what practical alternative sites and assignment plans, if any, are available. This catalog is not complete. Doubtless other pertinent factors will be suggested to court and counsel. From all of them the court objectively can determine whether the new school will take its place in a non-discriminatory system or continue *de facto* the city's former *de jure* dual system of white and Negro schools." 397 F.2d at 42.

We noted earlier in this opinion that Dr. Estes, at the February 16, 1972, hearing below, in answer to the question of whether race was given an overriding consideration vis-a-vis all the factors considered by the DISD, stated that: "Well, the overriding consideration was providing facilities for those students in the attendance zones as established by the Court order on August 2nd". The attendance zones established by the August 2, 1971 judgment were, for the most part, the same zones which had been employed by the DISD over previous academic years to implement its "neighborhood school concept". As the district court found in this case, the "neighborhood school concept" has resulted in the perpetuation of the vestiges of the dual school system in the DISD.

■ We have not the competence to tell the DISD and the district court where new schools should be built, which facilities should re renovated, and which buildings should be abandoned. But we are nevertheless competent to determine that the school authorities and the district court have not accorded proper weight to the racial composition of student bodies in considering the selection and acquisition of new sites and the construction of new facilities. Accordingly, we hold that the district court erred in ruling adversely to the plaintiffs in # 71–2184 and # 72–1381, the site selection and school construction appeals. Under this disposition we need not consider the appellants' additional argument

that the district court violated the terms of its August 2, 1971 judgment by approving the DISD's site selection and school construction projects despite the Tri-Ethnic Committee's refusal to approve these undertakings.

## THE STATUS OF MEXICAN–AMERICANS IN THE DISD

As to the issue of the status of Mexican-Americans in the DISD for the purposes of school desegregation the district judge found that Mexican-Americans did constitute a separate ethnic grouping and would be treated as such for desegregation purposes even though it had not been established at trial that they had been subjected to *de jure* segregation by the DISD. The plaintiffs, in this court, challenge the district court's finding of no history of *de jure* segregation and assert that they were hampered at trial in their efforts to prove such discrimination by the trial judge's refusal to permit the plaintiffs to pursue discovery for the years prior to 1965. But the district court's decision to treat Mexican-Americans as a separate ethnic minority group for remedial purposes is of course endorsed by the appellants. The DISD argues that no such class as Mexican-Americans was established at trial and that the DISD was not proved to have practiced *de jure* discrimination against Mexican-Americans.

■ While the record of the DISD's history of practicing *de jure* discrimination against Mexican-Americans is not as fully developed as we would prefer, we believe that the district court correctly treated Mexican-Americans within the DISD as a separate ethnic minority group for desegregation purposes. Sufficient statistical evidence is available in the record to establish the isolation of Mexican-American students in the DISD from white students and the DISD's practice of "integrating" its Mexican-American students with black students. Sitting en banc, we held in *United States v. Texas Education Agency, Austin Independent School District*, 5 Cir. 1972, 467 F.2d 848 (motion for clarifica-

tion denied 1973, 470 F.2d 1001) that at least in the State of Texas, segregation of Mexican-Americans in the public schools constitutes a deprivation of the equal protection of the laws in violation of the Fourteenth ·Amendment to the United States Constitution. See also our en banc decision in *Cisneros v. Corpus Christi Independent School District*, supra, both original and specially concurring opinions. Cf. *Keyes v. School District No. 1*, 1973, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548; *Hernandez v. Texas*, 1954, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866.

We perceive no error in the decision below to treat Mexican-American students in the DISD as a distinct ethnic minority group for purposes of school desegregation.

## THE DISTRICT COURT'S REPORTING REQUIREMENTS

■ The DISD argues on this appeal that the district court correctly interpreted our language in *United States v. Hinds County School Board*, 5 Cir. 1970, 433 F.2d 611, 618, by requiring the DISD to submit desegregation reports on an annual basis after April 15, 1972. We disagree. In *Hinds County*, supra, we directed that semi-annual reports be filed with the district court on the progress made towards conversion to a unitary school system. The lower court's order in this respect is difficult to understand as our order on the prior appeal stated:

"The district court shall require the school board to file semi-annual reports during the school year similar to those required in United States v. Hinds County School Board, 5 Cir. 1970, 433 F.2d 619." *Tasby v. Estes*, 5 Cir. 1971, 444 F.2d 124.

## THE DISTRICT COURT'S COMPLIANCE WITH SINGLETON

■ Our *Singleton* decision, supra, established the following faculty and staff desegregation standards:

"Effective not later than February 1, 1970, the principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students. For the remainder of the 1969–70 school year the district shall assign the staff described above so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system." 419 F.2d at 1217–1218.

In its brief, the DISD informs us:

"The District's Superintendent stated that assuming a teacher-ratio of 25% black and 75% white that the provision 'no more than 10% variance, above and below, in each school' (Plan p. 1) would mean a variation of 2½% from 25%; i. e., a variation from 22½ to 27½ on black teachers and 72½ to 77½ for white teachers; that the variance is not to be used to permit a 15% black percentage in a particular building; that the variance is not an effort to dilute the Singleton formula but to allow for practical problems in the school business arising out of availability of teachers, qualification of teachers under state law and the size of the school and faculty needed in some schools, especially the smaller ones. (T. 668–670)."
Brief for the DISD, pp. 43–44.

We understand that the appellant's position is that if the 10% variation provision in the district court's faculty and staff desegregation order is invoked to permit deviations no greater than those specified in the DISD's brief then, in that event, the plaintiffs-appellants have no objection to the lower court's order. We understand and sympathize with the plaintiffs' reluctance to acquiesce in the language of the ·district court's order, but view the assurances provided by the DISD in this regard as adequate. Should the DISD welsh on these explicit

representations, the district court and eventually this court are available to the plaintiffs for appropriate relief. Accordingly, subject to the DISD's assurances, the faculty and staff desegregation order of the district court will not be disturbed by this court on this appeal.

## THE CONTENTIONS OF THE INTERVENORS

Because we have rejected as constitutionally inadequate the district court's elementary and secondary student assignment plans, we pretermit discussion of the objections lodged by the Oak Cliff Citizens to those plans and to the manner in which they were adopted.

■ We know of no authority requiring the district court to apportion positions on a bi-racial or tri-ethnic committee according to a one-man, one-vote theory. For this reason, we find the Oak Cliff Citizens' objection to the composition of the Tri-Ethnic Committee established by the district court to be without merit.

■ We are unimpressed with the argument of the Donald G. Curry group of intervenors. It is simply irrelevant that the section of the DISD in which they reside was undeveloped at the time *Brown I* was decided. The Curry group's residential area is not thereby insulated from a judicial directive to the DISD to convert from a dual to a unitary school system. In *Swann*, supra, the Supreme Court took notice of the expansion of predominantly white suburban sections far removed from Negro population centers. We find nothing in the *Swann* decision which could be construed as supporting the Curry group's contention. To the contrary, the *Swann* rationale envisions the inclusion of newly developed residential areas within a formerly dual school district in the formulation and implementation of school desegregation plans.

Originally one of the more controversial facets of this complicated proceeding was presented by the position of the Herman Bond group of intervenors that the student assignment aspects be remanded to the district court with directions to join the independent school districts adjacent to the DISD as defendants and to formulate a single public school desegregation plan for the entire metropolitan area of Dallas. Such a course of action involving cross-district bussing and pairing of schools in order to achieve greater desegregation than was possible in the single district comprised of the city of Richmond, Virginia, was sponsored by Judge Merhige in *Bradley v. School Board of City of Richmond, Virginia*, E.D.Va.1972, 338 F.Supp. 67. Judge Merhige's order was reversed by the Fourth Circuit en banc, 462 F.2d 1058 (1972).

The complexity of the issue (and its bearing on *Tasby*) was such that when the United States Supreme Court granted certiorari in *Bradley*, we withheld ruling in these cases to await the high Court's decision. Our waiting proved unproductive. The Supreme Court, with Mr. Justice Powell taking no part, affirmed *per curiam* by an equally divided Court, *School Board of City of Richmond v. State Board of Education*, 1973, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771. It is our understanding that Mr. Justice Powell did not participate because his former law firm was at one time counsel for either the Richmond School Board or the State Board of Education of Virginia.

About this time the issue of a metropolitan inter-district desegregation plan emerged in a case from another area, the City of Detroit and its environs in Wayne County, Michigan. The district court directed the preparation of such a plan and purchase of school buses to implement it, *Bradley, et al. v. Milliken*, E.D.Mich.1972, 345 F.Supp. 914, after ruling that the Detroit school system was an illegally segregated one, 338 F.Supp. 582, and after an interlocutory appeal to the Sixth Circuit, 468 F.2d 902. The Sixth Circuit en banc affirmed in part, vacated in part, and remanded for further proceedings. But it affirmed the key holding that a constitutionally ade-

quate system of desegregated schools could not be established within the Detroit school district's geographic limits, and that a multi-district metropolitan plan was necessary. *Bradley v. Milliken,* 6 Cir. 1973, 484 F.2d 215.

Again the Supreme Court granted certiorari and we determined to await its ruling. The Supreme Court reversed 5–4, *Milliken, et al. v. Bradley, et al.,* 1974, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069.

The core of the Court's holding in *Bradley,* as explicated for the majority by the Chief Justice is the following:

The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. *Swann, supra,* 402 U.S., at 16, 91 S.Ct., at 1276. Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of inter-district segregation. Thus an inter-district remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an inter-district remedy would be appropriate to eliminate the inter-district segregation directly caused by the constitutional violation. Conversely, without an inter-district violation and inter-district effect, there is no constitutional wrong calling for an inter-district remedy.

The record before us, voluminous as it is, contains evidence of *de jure* segregated conditions only in the Detroit schools; indeed, that was the theory on which the litigation was initially based and on which the District Court took evidence. See pp. 18–19, *supra.* With no showing of significant violation by the 53 outlying school districts and no evidence of any inter-district violation or effect, the court went beyond the original theory of the case as framed by the pleadings and mandated a metropolitan area remedy. To approve the remedy ordered by the court would impose on the outlying districts, not shown to have committed any constitutional violation, a wholly impermissible remedy based on a standard not hinted at in *Brown I* and *II* or any holding of this Court.

*Ibid* at 744–745, 94 S.Ct. at 3127, 41 L.Ed.2d at 1091–1092.

■ There is in this record no suggestion of violation by the outlying independent school districts in Dallas County of these principles so as to warrant imposition of a multi-district plan. The contentions of the Herman Bond group of intervenors are accordingly rejected.

### PROCEEDINGS FOLLOWING REMAND

It is clear from the foregoing that further proceedings will be required below. The following comments, even though based upon a stale record, are intended to provide guidance to the district court in its further efforts to dismantle the dual school structure within the DISD.

In view of the almost twenty years since legal proceedings were initiated to desegregate the DISD by the plaintiffs in *Brown v. Rippy,* supra, both the courts and the DISD have proceeded with "all deliberate speed". *Brown II,* supra. Endurance records perhaps, but not speed records have been set in this and the prior litigation. The "all deliberate speed" timetable has been superseded and the Supreme Court has made it clear that "under explicit holdings of this Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools". *Alexander v. Holmes County Board of Education,* 1969, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19.

It is imperative that the dual school structure of the DISD be completely dismantled by the start of the second semester of the 1975–76 academic year. The district court should immediately take the necessary steps, using and adapting the techniques discussed in *Swann, supra,* to make that objective a reality.[5]

To insure that our mandate is carried out in a timely manner, it is directed:

(a) In # 71–2184 and # 72–1381, the judgments of the district court are reversed and the causes are remanded with directions to evaluate all of the site acquisition, school construction and facility abandonment plans put forward by the DISD in light of the impact which these undertakings will have upon the disestablishment of the dual school system. Only those projects which will foster the desegregation process should be approved by the district court and such approval should be given only after full hearing and after the making of findings of fact and conclusions of law regarding each such project.

(b) In # 71–2581, the judgment of the district court is vacated and the cause is remanded with directions to formulate, in time for the start of the second semester of the 1975–76 school year, elementary and secondary student assignment plans which comport with the directives of the Supreme Court and of this opinion.

(c) No later than October 15, 1975, the district court should file with the Clerk of this court a detailed progress report, covering the matters discussed in this opinion, concerning the desegregation of the DISD. We will then determine if further action on our part is required to insure the desegregation of the DISD no later than the middle of the 1975–1976 school year.

(d) The district court's *Hinds County* reporting provisions are modified so as to require semi-annual submission of reports to the district court and, as modified, are affirmed.

(e) The district court's decision to treat Mexican-Americans as a distinct ethnic group for purposes of public school desegregation is affirmed.

(f) The district court's faculty and staff desegregation provisions are affirmed, subject to the assurances given by counsel for the DISD discussed *supra.*

(g) The request of the Herman Bond group to remand the cause to the district court for the purpose of formulating a single desegregation plan for the Dallas metropolitan area is denied.

In view of the time factors involved, the Clerk of this Court is directed to issue our mandate immediately.

Affirmed in part, reversed in part, and remanded with directions.

---

5. We believe that the DISD has sufficient financial resources to comply with this directive. School buses, although not presently owned by the DISD in sufficient numbers to carry out meaningful desegregation, can be leased or purchased with the funds which, but for our decision, would have been used to implement the district court's elementary "television plan".